SOUTHWEST OHIO REGIONAL TRANSIT AUTHORITY, APPELLEE, *v.* AMALGAMATED TRANSIT UNION, LOCAL 627, APPELLANT.

[Cite as *Southwest Ohio Regional Transit Auth. v. Amalgamated Transit Union, Local 627* (2001), 91 Ohio St.3d 108.]

(No. 00–21—Submitted November 14, 2000—Decided March 7, 2001.)

LUNDBERG STRATTON, J. Appellee, Southwest Ohio Regional Transit Authority ("SORTA"), operates a mass transit system in the greater Cincinnati area. Appellant, Amalgamated Transit Union, Local 627 ("Union"), is a labor union that represents certain SORTA employees, including bus maintenance workers. SORTA and the Union negotiated a collective bargaining agreement ("CBA"). Under the CBA, SORTA or the Union may submit to arbitration any otherwise unresolved grievance that arises from the interpretation or application of its terms. The CBA also provided that "[t]here shall be no discharge, suspension or other disciplinary action without sufficient cause."

In 1995, SORTA adopted a drug-and-alcohol-prevention policy ("drug policy"), which subjects "safety sensitive" employees to random drug testing. The test employed by SORTA incorporates federal standards under which an employee is tested to determine if certain metabolites, which are a byproduct of marijuana use, are present in the employee's urine. SORTA describes its drug policy as a "zero tolerance" policy; in other words, if an employee tests positive, the employee is terminated.

Marc Sundstrom was a Union member who was employed by SORTA as a bus repairperson, which was classified as a "safety sensitive" position. Sundstrom's position required him to have a commercial driver's license in order to test drive

the buses that he repaired. On February 10, 1997, Sundstrom was subjected to a random drug test pursuant to SORTA's drug policy. Sundstrom tested positive for metabolites in his blood and was summarily discharged pursuant to SORTA's zero tolerance policy.

The Union filed a grievance on Sundstrom's behalf, which was referred to arbitration pursuant to the CBA. The arbitration panel sustained the grievance in part and denied it in part. The panel found that the decision to discharge Sundstrom was based solely upon his violation of the drug policy. The panel found that SORTA's drug policy was facially valid and that testing positive was a dischargeable offense. However, the panel determined that the drug policy's automatic discharge sanction for testing positive conflicted with, and therefore violated, the "sufficient cause" discharge standard set out in the CBA. After considering the length of Sundstrom's service and his lack of any prior disciplinary problems, the panel found that Sundstrom had been discharged without sufficient cause. Accordingly, the panel decided that Sundstrom should be reinstated. However, the panel denied Sundstrom back pay, required him to complete a drug-and-alcohol rehabilitation program, and subjected him to unannounced drug testing. The award stated that failure to comply with any of these requirements or a positive drug test would result in Sundstrom's immediate dismissal.

SORTA appealed the arbitration award to the Court of Common Pleas of Hamilton County. The court confirmed the award, holding that it drew its essence from the CBA and was not unlawful, arbitrary, or capricious.

SORTA appealed to the Hamilton County Court of Appeals. The court of appeals reversed the arbitration award, holding that "reinstating Sundstrom, a safety-sensitive employee who tested positive for marijuana while on the job, would violate the explicit, well-defined and dominant public policy to ensure the safety of the passengers of common carriers and the general public by suppressing illegal drug use among transportation employees."

This cause is now before this court pursuant to the allowance of a discretionary appeal.

The case presents two issues before this court. The first is whether the award should be vacated because it fails to draw its essence from the CBA. The second is whether the award is against public policy and should be vacated as being unlawful.

*The Award Draws its Essence from the CBA*
*and is not Arbitrary or Capricious*

Public policy favors arbitration. *Brennan v. Brennan* (1955), 164 Ohio St. 29, 57 O.O. 71, 128 N.E.2d 89, paragraph one of the syllabus. "The whole purpose of

arbitration would be undermined if courts had broad authority to vacate an arbitrator's award." *Mahoning Cty. Bd. of Mental Retardation & Dev. Disabilities v. Mahoning Cty. TMR Edn. Assn.* (1986), 22 Ohio St.3d 80, 83–84, 22 OBR 95, 98, 488 N.E.2d 872, 875. "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract." *United Paperworkers Internatl. Union, AFL–CIO v. Misco, Inc.* (1987), 484 U.S. 29, 37–38, 108 S.Ct. 364, 370–371, 98 L.Ed.2d 286, 299. Accordingly, courts are limited to determining whether an arbitration award is unlawful, arbitrary, or capricious and whether the award draws its essence from the CBA. *Findlay City School Dist. Bd. of Edn. v. Findlay Edn. Assn.* (1990), 49 Ohio St.3d 129, 551 N.E.2d 186, paragraph two of the syllabus, superseded by statute on other grounds, see *Cincinnati v. Ohio Council 8, Am. Fedn. of State, Cty. & Mun. Emp., AFL–CIO* (1991), 61 Ohio St.3d 658, 661–662, 576 N.E.2d 745, 750. An award draws its essence from the CBA when there is a rational nexus between the CBA and the award. *Mahoning Cty. Bd. of Mental Retardation,* 22 Ohio St.3d 80, 22 OBR 95, 488 N.E.2d 872, paragraph one of the syllabus.

SORTA states that it adopted its drug policy pursuant to Section 26(a) of the CBA. SORTA argues that the award, that reinstated Sundstrom, did not draw its essence from the CBA because it ignored the automatic discharge sanction required by SORTA's drug policy. We disagree.

We find that any sanction for a violation of a rule adopted by SORTA pursuant to Section 26(a) of the CBA was subject to the "sufficient cause" standard for dismissing employees found in Section 3(b) of the CBA. See *Local No. 7, United Food & Commercial Workers Internatl. Union v. King Soopers, Inc.* (C.A.10, 2000), 222 F.3d 1223. In *King Soopers,* the union and King Soopers negotiated a CBA that provided that no union employee would be terminated without "good and sufficient cause." *Id.* at 1225. However, King Soopers also unilaterally adopted a "no call/no show" policy that provided that three unexcused absences would result in immediate discharge. Lally Parbhu, a union member and employee at King Soopers, failed to provide an excuse for a two-week absence. King Soopers dismissed her pursuant to the no-call/no-show policy.

The union filed a grievance protesting Parbhu's dismissal. The arbitrator issued an award that reinstated Parbhu, finding that while it was possible that a

violation of the no-call/no-show policy could be grounds for immediate termination, Parbhu's discharge did not meet the test of just cause.

King Soopers appealed, and the appellate court affirmed the arbitrator's award that reinstated Parbhu, reasoning that "[a]lthough the CBA negotiated between King Soopers and the Union gives King Soopers 'the right * * * to make necessary reasonable rules and regulations for the conduct of business, providing that said rules and regulations are not in conflict with the terms of [the CBA] in any way,' * * *, *the right to make such rules is not the right to equate the violation of such rules with 'good and sufficient cause' for termination. To hold otherwise would be to allow King Soopers to unilaterally define the meaning of 'good and sufficient cause,' a right which was not contemplated by the CBA and for which King Soopers must negotiate with the Union.*" (Emphasis added.) *Id.* at 1227.

We agree with, and apply, the reasoning of *King Soopers* to this case. While SORTA's drug policy may be facially valid, we find that SORTA did not have the right to *unilaterally* adopt automatic termination without possibility of reinstatement as a sanction for testing positive, because such a sanction conflicts with the "sufficient cause" requirement for dismissal found in Section 3(b) of the CBA. Just as the court noted in *King Soopers*, allowing SORTA to enforce automatic termination would allow an employer to unilaterally adopt a sanction that conflicts with the sufficient-cause requirement for dismissal that was negotiated into the CBA, thereby undermining the integrity of the entire collective bargaining process. The proper avenue for SORTA to adopt such a sanction would be through the collective bargaining process, not through a unilateral decision.

Section 26(a) of the CBA, under which SORTA contends that it adopted its drug policy, further supports our conclusion. It states that SORTA *"will provide that there is no conflict between orders and rules* [adopted pursuant to Section 26] *and the provisions of this contract."* (Emphasis added.) Thus, by adopting immediate dismissal as a sanction for violating the drug policy, SORTA created a conflict with Section 3(b) of the CBA, which allows employees to be terminated only for sufficient cause.

Therefore, we find that the automatic dismissal sanction under SORTA's drug-prevention policy violates the sufficient-cause requirement for dismissal of the CBA. Thus, because the panel's award reinstating Sundstrom was based on the sufficient-cause standard set out in the CBA, the award drew its essence from the CBA and was not arbitrary or capricious.[1]

---

1. SORTA argues that the arbitration award fails to draw its essence from the CBA because the panel failed to enforce the automatic discharge sanction pursuant to SORTA's drug policy. However, SORTA does not specifically argue that the award was arbitrary or capricious. That, in

*The Award is Lawful because it is not against Public Policy*

SORTA further contends, and the appellate court held, that even if the award draws its essence from the CBA, public policy against drug use requires mandatory termination of a "safety sensitive" employee who fails a drug test. We must examine whether there is such a public policy that would render the award reinstating Sundstrom unenforceable.

In *W.R. Grace & Co. v. Local 759, Internatl. Union of Rubber, Cork, Linoleum & Plastic Workers of Am.* (1983), 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298, 307, the United States Supreme Court held if the interpretation of a CBA violates public policy, the resulting award is unenforceable. However, the *Grace* court also cautioned that the public policy "must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Id.,* quoting *Muschany v. United States* (1945), 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744, 755. Thus, vacating an arbitration award pursuant to public policy is a narrow exception to the "hands off" policy that courts employ in reviewing arbitration awards and "does not otherwise sanction a broad judicial power to set aside arbitration awards as against public policy." *Misco,* 484 U.S. at 43, 108 S.Ct. at 373, 98 L.Ed.2d at 302. Accordingly, we must examine "laws and legal precedents" in order to determine if there is any public policy that would render the award reinstating Sundstrom unenforceable.

SORTA argues that the General Assembly has codified a public policy against use of alcohol or controlled substances by transportation employees in R.C. 4506.15. We agree with this assertion. However, we find that this statute does not indicate that public policy precludes *reinstatement* of a "safety sensitive" employee who tests positive for alcohol or a controlled substance. Ohio punishes persons who drive commercial motor vehicles "while having a measurable or detectable amount of * * * alcohol or a controlled substance in his * * * urine" or "while under the influence of a controlled substance" by suspending the guilty party's commercial driver's license. R.C. 4506.15(A) and (C); 4506.16. However, except where a person has multiple convictions or where the person is convicted of an offense involving drug trafficking, there is no permanent termination of the guilty party's commercial license. Even certain persons who have their license revoked "for life" may have their license reinstated if they undergo a rehabilitation program. Ohio Adm.Code 4501:1–1–26. Thus, we find that this law does not dictate a public policy that precludes a person who tests positive for a controlled substance from having a second chance.

---

conjunction with our failure to find any evidence to support such a conclusion, persuades us to conclude that the award was not arbitrary or capricious.

In Ohio, two appellate districts have held that enforcement of an arbitration award reinstating a safety-sensitive employee who tested positive for a controlled substance or alcohol is against public policy. See *Cleveland Bd. of Edn. v. Internatl. Bhd. of Firemen & Oilers Local 701* (1997), 120 Ohio App.3d 63, 696 N.E.2d 658 (Eighth District); *Southwest Ohio Regional Transit Auth. v. Amalgamated Transit Union, Local 627* (Sept. 28, 1994), Hamilton App. No. C–930423, unreported, 1994 WL 525543. In examining Ohio law, both decisions relied upon *Dietrich v. Community Traction Co.* (1964), 1 Ohio St.2d 38, 30 O.O.2d 22, 203 N.E.2d 344, which stated that "[i]t is generally recognized that the duty of a common carrier of passengers is to exercise the highest degree of care for the safety of its passengers." *Id.* at 41, 30 O.O.2d at 23, 203 N.E.2d at 347. The courts in both *Local 701* and *Local 627* found that the duty defined in *Dietrich* precludes the reinstatement of a safety-sensitive employee who tested positive for a controlled substance or alcohol as a matter of public policy. We find that the law suggests something quite different.

Consistent with a common carrier's duty to exercise the highest degree of care for its passengers, and pursuant to its authority to regulate motor transportation companies under R.C. 4921.04, the Public Utilities Commission of Ohio has adopted certain United States Department of Transportation safety standards. See Ohio Adm.Code 4901:2–5–02(A). In particular, the Public Utilities Commission has adopted Section 382, Title 49, C.F.R., which addresses testing of commercial motor vehicle operators for alcohol and controlled substances.

Because Ohio law relies on and incorporates federal laws and regulations, in particular Part 382, Title 49, C.F.R., we must examine federal policy. In an almost identical case, the United States Supreme Court has recently examined whether *federal law* and implementing *regulations* that require drug testing of safety-sensitive employees, including Part 382, Title 49, C.F.R., make an arbitration award reinstating such an employee who tested positive for a controlled substance unenforceable pursuant to public policy. *Eastern Associated Coal Corp. v. United Mine Workers of Am., Dist. 17* (2000), 531 U.S. ——, 121 S.Ct. 462, 148 L.Ed.2d 354. In *Eastern*, Smith, a union employee, tested positive for drugs and was immediately terminated. An arbitrator determined that Smith's positive drug test did not amount to "just cause" for discharge pursuant to the CBA. The award was upheld on appeal.

On appeal to the Supreme Court, Eastern argued that public policy against drug use, as reflected in the federal law and regulations that require drug testing, rendered the arbitration award reinstating Smith unenforceable. The court determined that "the question to be answered is not whether Smith's drug use itself violates public policy, but whether the agreement to reinstate him does so." *Eastern*, 531 U.S. at ——, 121 S.Ct. at 467, 148 L.Ed.2d at 361.

In determining if there was a public policy to render the award unenforceable, the court examined the Omnibus Transportation Employee Testing Act of 1991, Section 31306, Title 49, U.S.Code, and DOT's implementing regulations. The court found that "these expressions of positive law embody several relevant policies," including "policies against drug use by employees in safety-sensitive transportation positions and in favor of drug testing," as well as a "policy favoring rehabilitation of employees who use drugs." *Id.*, 531 U.S. at ——, 121 S.Ct. at 468, 148 L.Ed.2d at 363. Pertinent to its conclusion was the court's consideration of Part 382, Title 49, C.F.R., which defines the circumstances under which a safety-sensitive employee who tested positive for drugs may return to work. *Id.*, 531 U.S. at ——, 121 S.Ct. at 468, 148 L.Ed.2d at 362, citing Section 382.605, Title 49, C.F.R. Applying this holding, the court determined that the award did not condone Smith's conduct or ignore the risk drug use poses to the public. Instead, the award punished Smith by suspending him for three months without pay, requiring him to pay the arbitration costs for both sides, subjecting him to substance-abuse treatment and testing, and making it clear that another failed test would result in discharge. *Id.* Thus, the court held that the award reinstating Smith was not contrary to any "explicit," "well defined," "dominant" public policy. *Id.*, 531 U.S. at ——, 121 S.Ct. at 469, 148 L.Ed.2d at 364.

Because Ohio has adopted Part 382, Title 49, C.F.R., and because Ohio has no other law or legal precedent mandating termination, we hold that Ohio has no dominant and well-defined public policy that renders unlawful an arbitration award reinstating a safety-sensitive employee who was terminated for testing positive for a controlled substance, assuming that the award is otherwise reasonable in its terms for reinstatement.

The arbitration award herein punished Sundstrom by denying him back pay. It also required Sundstrom to attend a rehabilitation program, to pass a return-to-work drug test, and to take unannounced drug tests upon reinstatement. Failure to complete rehabilitation or a positive test result would result in Sundstrom's immediate discharge. Considering the length of Sundstrom's employment and his lack of disciplinary problems, we find that the terms for reinstatement were reasonable in that they imposed punishment and provided safeguards to prevent recidivism.

Thus, we hold that the award reinstating Sundstrom was not against public policy, and thus was lawful.[2]

---

2. SORTA's own drug policy, based on federal regulations that have provisions similar to those addressed in *Eastern*, belies any safety concern requiring dismissal of all employees who have used drugs. SORTA's drug policy provides a second chance to those employees who voluntarily come forward and admit to drug use prior to any positive test. These employees may retain their position with SORTA contingent upon completion of the rehabilitation program and continuing

This holding does not imply that drug use may never be a basis for automatic discharge. An employee's overall disciplinary record, the egregiousness of the infraction, problems with recidivism, or other issues could constitute sufficient cause for discharge. Of course these are matters that are contingent upon the terms of the CBA, as well as the arbitrator's interpretation of those terms.

## Conclusion

We hold that the arbitration award reinstating Sundstrom drew its essence from the CBA and was not unlawful, arbitrary, or capricious. Accordingly, we reverse the judgment of the court of appeals and order that the arbitration award be reinstated.

*Judgment reversed.*

MOYER, C.J., RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

DOUGLAS, J., concurs in judgment.

COOK, J., dissents.

---

**COOK, J., dissenting.** Like the majority, I disagree with the court of appeals' holding that reinstating Sundstrom would violate an explicit, well-defined, and dominant public policy. I would, nonetheless, affirm the court of appeals' judgment because I agree with the Southwest Ohio Regional Transit Authority ("SORTA") that the panel's award did not draw its essence from the CBA.

On the one hand, the majority concedes that SORTA's drug policy may be "facially valid." On the other hand, the majority finds that the policy "violates the sufficient-cause requirement for dismissal of the CBA." But neither the majority nor the panel can have it both ways. The arbitration panel in this case found it difficult to determine whether the union had ever actually challenged the facial validity of the drug policy. The panel concluded, however, that to the extent the union *did* challenge the facial validity of the rule, "the Authority's Policy is facially valid." This valid rule was thereby "incorporated into the collective bargaining agreement and [had] the force of contract language." *Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Internatl. Union* (C.A.4, 1996), 76 F.3d 606, 610. Under the express terms of Section 3(d) of the CBA, the panel had "no authority to alter, amend, modify, add to, subtract from or change the terms" of the agreement.

---

negative drug test results. Thus, the differing sanctions of SORTA's own drug policy negate any policy argument that safety requires a "zero tolerance" policy.

But like the arbitrator in *Mountaineer Gas, supra,* the arbitration panel here "ignored the unambiguous language of the Drug Policy and fashioned a modified penalty that appealed to [its] own notions of right and wrong. * * * By fashioning [a] new remedy and infusing [its] personal feelings and sense of fairness into the award, the [panel] created an award that failed to draw its essence from the CBA." *Id.,* 76 F.3d at 610. As the United States Supreme Court has noted, though arbitrators may certainly interpret CBA provisions, they cannot disregard them, and "[do] not sit to dispense [their] own brand of industrial justice." *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.* (1960), 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424, 1428. The Sixth Circuit has agreed, and vacated an arbitrator's award of reinstatement when the CBA provided that an employee could be "discharged without [redress] if proven guilty of * * * insubordination." *Morgan Serv., Inc. v. Local 323, Chicago & Cent. States Joint Bd., Amalgamated Clothing & Textile Workers Union, AFL–CIO* (C.A.6, 1984), 724 F.2d 1217, 1219.

The majority describes the United States Supreme Court's recent *Eastern Associated Coal Corp.* decision as "an almost identical case." *Eastern Associated Coal Corp. v. United Mine Workers of Am., Dist. 17* (2000), 531 U.S. ——, 121 S.Ct. 462, 148 L.Ed.2d 354. But *Eastern* differs markedly from the case at bar. In *Eastern,* the Supreme Court expressly assumed that the CBA at issue provided for reinstatement, and also specifically noted that the employer had never claimed that the arbitrator acted outside the scope of his contractually delegated authority. *Id.* at ——, 121 S.Ct. at 466–467, 148 L.Ed.2d at 360–361. Unlike the employer in *Eastern,* however, SORTA *has* consistently claimed that the panel acted outside the scope of its contractually delegated authority. SORTA did so in its complaint and application to vacate the arbitration award, in its brief to the court of appeals, and in its merit brief to this court. Accordingly, although I agree with *Eastern*'s holding that public policy considerations do not preclude enforcement of reinstatement awards such as the one at issue here, *Eastern* did not overturn *Enterprise Wheel, supra,* and does not compel today's result. See *Eastern,* 531 U.S. at ——, 121 S.Ct. at 466, 148 L.Ed.2d at 360 ("Of course, an arbitrator's award 'must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice,'" quoting *United Paperworkers Internatl. Union, AFL–CIO v. Misco, Inc.* [1987], 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286, 299). I would, therefore, affirm the judgment of the court of appeals.

---

*Dinsmore & Shohl LLP, Charles M. Roesch* and *Robert J. Reid,* for appellee.

*Kircher, Robinson & Welch* and *James B. Robinson; Jubelirer, Pass & Intrieri, P.C.,* and *Ernest B. Orsatti,* for appellant.

*Stewart Jaffy & Associates Co., L.P.A., Stewart R. Jaffy* and *Marc J. Jaffy,* urging reversal for *amicus curiae* Ohio AFL–CIO.

*Baker & Hostetler LLP, David C. Levine, Daniel J. Guttman* and *Stephen D. Brown,* urging affirmance for *amicus curiae* Ohio Public Transit Association.

TRUE CHRISTIANITY EVANGELISM, APPELLANT,
*v.* ZAINO, TAX COMMR., APPELLEE.

[Cite as *True Christianity Evangelism v. Zaino* (2001), 91 Ohio St.3d 117.]

(No. 00–292—Submitted January 10, 2001—Decided March 7, 2001.)

*Per Curiam.* Appellant seeks exemption for a two-story house in Akron. Over a year ago in *True Christianity Evangelism v. Tracy* (1999), 87 Ohio St.3d 48, 716 N.E.2d 1154, we remanded this matter to the Board of Tax Appeals ("BTA") to determine whether appellant used the property exclusively for charitable purposes.

The BTA found that the property is neither open to the public nor used in public worship. No one resides in the house. Jeffrey A. Botzko, appellant's president, is the only person using the property. After remand, the BTA denied the exemption because the property was not being used exclusively for charitable purposes. This cause is now before this court upon an appeal as of right.

Appellant seeks exemption under R.C. 5709.12, which states that "[r]eal * * * property belonging to institutions that is used exclusively for charitable purposes shall be exempt from taxation."

We are to strictly construe statutes granting exemption, and the burden rests on the one claiming an exemption to demonstrate that the property qualifies.

*OCLC Online Computer Library Ctr., Inc. v. Kinney* (1984), 11 Ohio St.3d 198, 11 OBR 509, 464 N.E.2d 572.

To be exempted from taxation under R.C. 5709.12, the property must (1) belong to an institution and (2) be used exclusively for charitable purposes. *Highland Park Owners, Inc. v. Tracy* (1994), 71 Ohio St.3d 405, 406, 644 N.E.2d 284, 286. The BTA found that appellant was an institution, and that finding has not been challenged; thus, the property belonged to an institution.

The BTA next found that the primary use of the property was "an evangelistic one." On the basis of this finding, the BTA stated that "a distinction may be drawn between charitable and religious institutions and the activities in which they engage." The BTA cited for support *Summit United Methodist Church v. Kinney* (1982), 2 Ohio St.3d 72, 2 OBR 628, 442 N.E.2d 1298; *Summit United Methodist Church v. Kinney* (1983), 7 Ohio St.3d 13, 7 OBR 406, 455 N.E.2d 669; and *Operation Evangelize–Youth Mission, Inc. v. Kinney* (1982), 69 Ohio St.2d 346, 23 O.O.3d 315, 432 N.E.2d 200. We decline to follow these cases because they limited the application of R.C. 5709.12 to the entities described in R.C. 5709.121. The application of R.C. 5709.121 is limited by its terms to "[r]eal property and tangible personal property belonging to a charitable or educational institution or to the state or a political subdivision." R.C. 5709.121 does not limit the application of R.C. 5709.12 to other entities. This case applies only R.C. 5709.12.

In *Episcopal Parish v. Kinney* (1979), 58 Ohio St.2d 199, 201, 12 O.O.3d 197, 198, 389 N.E.2d 847, 848, we adopted Justice Stern's concurring opinion in *White Cross Hosp. Assn. v. Bd. of Tax Appeals* (1974), 38 Ohio St.2d 199, 203, 67 O.O.2d 224, 226, 311 N.E.2d 862, 864, wherein he stated that as regards R.C. 5709.12, "*any* institution, irrespective of its charitable or noncharitable character, may take advantage of a tax exemption if it is making exclusive charitable use of its property." (Emphasis *sic*.) Thus, R.C. 5790.12 is applicable to "any institution"; religious institutions are not excluded from the application of R.C. 5709.12. Conversely, the application of R.C. 5709.121 is limited to charitable or educational institutions or to the state or a political subdivision.

Thus, for purposes of exemption under R.C. 5709.12 whether the institution is religious or charitable is not a relevant factor. The relevant factor for determining exemption under R.C. 5709.12 is whether the institution is using the property exclusively for charitable purposes. In *Am. Commt. of Rabbinical College of Telshe, Inc. v. Bd. of Tax Appeals* (1951), 156 Ohio St. 376, 46 O.O. 217, 102 N.E.2d 589, paragraph one of the syllabus, we held, "If operated without any view to profit, an institution used exclusively for the lawful advancement of education and of religion is an institution used exclusively for charitable purposes, within the meaning of Section 2 of Article XII of the Constitution and of Section 5353,

General Code [now R.C. 5709.12]." See, also, opinion of Justice Taft concurring in judgment in *Cleveland Bible College v. Bd. of Tax Appeals* (1949), 151 Ohio St. 258, 261, 39 O.O. 70, 71, 85 N.E.2d 284, 285.

The BTA found that the primary use of the property was (1) "an evangelistic one" and (2) for "the preparation and dissemination of a religious message." At another point the BTA stated that the property was "used by Botzko in the preparation and deliverance of his evangelic message."

The term "evangelistic" is defined in Webster's Third New International Dictionary (1986) 786 as "**1:** of or relating to evangelism." "Evangelism" is defined as "**1:** the proclamation of the gospel; * * * the presentation of the gospel to individuals and groups by such methods as preaching, teaching, and personal or family visitation programs **2:** missionary, militant, or crusading zeal for or earnest advocacy of any cause." *Id.* In describing his activities, Botzko stated:

"My goal is to inspire, enthuse, or to badger people into actually reading the Bible and finding out what it says and living up to its standards. Or even apart from that, just encourage them to seek the highest moral standards they can from whatever source they will accept. Like I tried to encourage people who believe in the Koran to find the best moral standards in it and see if there is higher things in the Bible that you can go above what the Koran says.

"I try to promote true Christianity, but if I can't do that, I still try to promote the best moral standards part."

In another part of his testimony, Botzko described his activities as "distribution of the literature, influencing everyone I can, in any way, to live up to the better moral standards of the Bible, you know, thus not be a burden on society instead of acting contrary to the good moral standards which puts a burden on society; supporting them in prison, assuming their children, you know, and everything that goes into all the police work and social services that result from the fact that people are not living up to the best moral standards they could." In *Murdock v. Pennsylvania* (1943), 319 U.S. 105, 108, 63 S.Ct. 870, 872, 87 L.Ed. 1292, 1296, the court stated that "[t]he hand distribution of religious tracts is an age-old form of missionary evangelism—as old as the history of printing presses."

The question for consideration thus becomes whether the evangelistic activities of appellant constitute charitable purposes. The General Assembly has not defined what activities of an institution subject to R.C. 5709.12 and not R.C. 5709.121 constitute charitable purposes. However, in past cases we have held that "[i]n the absence of a legislative definition, 'charity,' in the legal sense, is the attempt in good faith, *spiritually*, physically, intellectually, socially and economically to advance and benefit mankind in general, or those in need of advancement and benefit in particular, without regard to their ability to supply that need from

other sources, and without hope or expectation, if not with positive abnegation, of gain or profit by the donor or by the instrumentality of the charity." (Emphasis added.) *Planned Parenthood Assn. of Columbus, Inc. v. Tax Commr.* (1966), 5 Ohio St. 2d 117, 34 O.O.2d 251, 214 N.E.2d 222, paragraph one of the syllabus. It is against this definition that appellant's activities must be measured to determine if they constitute a charitable purpose.

In *Herb Soc. of Am., Inc. v. Tracy* (1994), 71 Ohio St.3d 374, 376, 643 N.E.2d 1132, 1134, we stated, "The dissemination of useful information to benefit mankind is, traditionally, charity." In *Battelle Mem. Inst. v. Dunn* (1947), 148 Ohio St. 53, 60, 35 O.O. 9, 12, 73 N.E.2d 88, 92, we stated that "[g]enerally, the dissemination of knowledge for the edification and improvement of mankind is regarded as a charitable object." Likewise, in *Am. Issue Publishing Co. v. Evatt* (1940), 137 Ohio St. 264, 266, 18 O.O. 27, 28, 28 N.E.2d 613, 614, we held, " 'Charity' has been broadly defined as that which benefits mankind and betters its condition. Hence it has often been held by the courts that organizations engaged in discouraging the consumption of intoxicants are promoting individual and social welfare and come within the definition of a charity." In *Am. Humanist Assn., Inc. v. Bd. of Tax Appeals* (1963), 174 Ohio St. 545, 23 O.O.2d 210, 190 N.E.2d 685, we reversed a decision of the BTA that had denied exemption under R.C. 5709.12 to a not-for-profit corporation whose purposes were "to study and extend educational principles and ideals concerning human progress, values and welfare, and, in connection therewith, to publish magazines, books, pamphlets·and other forms of literature, and to engage lecturers in order that the purposes of the association may be accomplished." The association's properties were used for offices, conference and storage rooms, and an area where multilithing, addressing, and mailing were done.

The information disseminated by appellant attempts to encourage people to read the Bible and to live up to its moral standards. These efforts are a good-faith attempt to disseminate information to spiritually advance and benefit mankind in general. Under the definition of charity followed by this court, appellant's activities constitute charitable purposes.

The General Assembly has used the phrase "used exclusively" as a limitation in both R.C. 5709.07 (houses used exclusively for public worship) and R.C. 5709.12 (property used exclusively for charitable purposes). In *Moraine Hts. Baptist Church v. Kinney* (1984), 12 Ohio St.3d 134, 135, 12 OBR 174, 175, 465 N.E.2d 1281, 1282, this court held that for purposes of R.C. 5709.07, the phrase "used exclusively for public worship" was equivalent to "primary use." There is no indication that the phrase "used exclusively" as used in R.C. 5709.12 is to be interpreted differently than it is in R.C. 5709.07. Thus, when the BTA found that the primary use of the appellant's property was for an evangelic purpose it was

equivalent to the "exclusive use" being for evangelic purposes, which we have found to be charitable purposes.

Accordingly, for the reasons stated above, we find the decision of the BTA to be unreasonable and unlawful, and therefore we reverse it.

*Decision reversed.*

DOUGLAS, RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., dissent.

---

COOK, J., dissenting. Because I conclude that the Tax Commissioner and Board of Tax Appeals ("BTA") correctly denied the charitable use exemption sought here by True Christianity Evangelism, I respectfully dissent.

I

The BTA is vested "with wide discretion in determining the weight to be given to evidence and the credibility of witnesses which come before it. It is not the function of this court to substitute its judgment for that of the board on factual issues, but only to determine from the record whether the decision rendered by [the] board is unreasonable or unlawful. Thus, the proper scope of this court's review of the board's decision * * * is solely to determine from the record if the board's decision is supported by any probative evidence." (Citations omitted.) *Monsanto Co. v. Lindley* (1978), 56 Ohio St.2d 59, 63, 10 O.O.3d 113, 115, 381 N.E.2d 939, 942. The majority reverses the BTA's decision here without mentioning this deferential standard of review, but the record contains ample probative evidentiary support for the board's conclusions.

The majority assigns great weight to one particular finding in the record—the BTA's statement that "the primary use to which the property is devoted is an evangelistic one." Because this court has previously determined that "exclusive use" under another tax exemption statute can (sometimes) really mean "primary use," and because evangelistic uses can (sometimes) be characterized as charitable uses, the majority supports its decision granting the exemption with that phrase. A close reading of the BTA's decision, however, suggests that the majority has read this language out of context and overlooked other key evidence in the record.

When the BTA wrote that "the primary use to which the property is devoted is an evangelistic one," it did so in an attempt to analytically distinguish between a

broad category of charitable uses and a narrower category of evangelistic uses. The BTA reasoned:

"While aspects of Botzko's activities, and those of the institutions with which he is associated, may arguably be considered charitable in nature, the primary use to which the property is devoted is an evangelistic one. As tribunals have acknowledged in the past, a distinction may be drawn between charitable and religious institutions and the activities in which they engage."

To support this distinction, the BTA relied on several cases from this court. See, *e.g.*, *Summit United Methodist Church v. Kinney* (1983), 7 Ohio St.3d 13, 7 OBR 406, 455 N.E.2d 669; *Summit United Methodist Church v. Kinney* (1982), 2 Ohio St.3d 72, 2 OBR 628, 442 N.E.2d 1298; and *Operation Evangelize–Youth Mission, Inc. v. Kinney* (1982), 69 Ohio St.2d 346, 23 O.O.3d 315, 432 N.E.2d 200. The majority declines to follow these cases, deciding that they incorrectly limited the application of R.C. 5709.12 to the specific entities described in R.C. 5709.121.

Assuming, *arguendo*, that the majority correctly declines to follow the cases upon which the BTA relied, the BTA knew that the distinction it was attempting to draw between charitable and evangelistic uses was a narrow one—if such a distinction existed at all. Like today's majority, the board referred to the very broad definition of "charity" that appeared in this court's *Planned Parenthood* syllabus over three decades ago. *Planned Parenthood Assn. of Columbus, Inc. v. Tax Commr.* (1966), 5 Ohio St.2d 117, 34 O.O.2d 251, 214 N.E.2d 222, paragraph one of the syllabus. Due to the breadth of that definition, the BTA anticipated that at least some of Botzko's evangelical uses might also be deemed charitable ones. Accordingly, the board provided an alternative theory in support of its decision to deny the exemption. The board expressly noted that, "[t]o the extent an argument may continue to exist that evangelic and charitable are synonymous, we acknowledge the other uses of the property which are clearly not 'exclusively charitable.' * * * [W]hile a portion of Botzko's use of the subject property *may* be charitable in nature, we are unable to conclude that the use of the subject property is *exclusively* for charitable purposes.'" (Emphasis *sic*.) The "other uses" that the board expressly referred to here included (1) Botzko's storage of clothing and other personal items at the property, (2) Botzko's use of exercise equipment at the property to improve his own physical condition, and (3) Botzko's use of the property to prepare "personal ads in newspapers with the apparent purpose of soliciting women interested in leading a similar lifestyle such as his own."

In addition to these findings, which the majority does not discuss, the record contains Botzko's own testimony that he had not "really kept track of what was done" at the property. Because it was True Christianity Evangelism's burden to demonstrate entitlement to the charitable use exemption, *Episcopal Parish of*

*Christ Church, Glendale v. Kinney* (1979), 58 Ohio St.2d 199, 12 O.O.3d 197, 389 N.E.2d 847, the BTA's decision to uphold the Tax Commissioner's denial of the exemption is supported by probative evidence of record—the sworn testimony of True Christianity Evangelism's president, Botzko.

## II

I also question the majority's reliance on *Moraine Hts. Baptist Church v. Kinney* (1984), 12 Ohio St.3d 134, 12 OBR 174, 465 N.E.2d 1281. Instead of undercutting the BTA's analysis, *Moraine Hts.* actually supports it.

In *Moraine Hts.*, this court was asked to determine whether a forty-nine-acre church camp containing various separate buildings and facilities qualified for the R.C. 5709.07 exemption. To do so, this court reviewed three prior cases concerning this exemption, which requires the taxpayer to show that the property is "used exclusively for public worship." *Id.* at 135, 12 OBR at 175, 465 N.E.2d at 1282, citing *In re Bond Hill–Roselawn Hebrew School* (1949), 151 Ohio St. 70, 38 O.O. 527, 84 N.E.2d 270; *Bishop v. Kinney* (1982), 2 Ohio St.3d 52, 2 OBR 594, 442 N.E.2d 764; and *Summit United Methodist Church v. Kinney* (1983), 7 Ohio St.3d 13, 7 OBR 406, 455 N.E.2d 669. Like *Moraine Hts.* itself, each of these three cases addressed properties of a character far different from the two-story house at issue here.

In *Bond Hill–Roselawn*, for example, this court held that a Hebrew school building qualified for the public worship exemption even though the entire building was not used exclusively for public worship—a caretaker and his family lived in three rooms above the first floor. 151 Ohio St. at 71–73, 38 O.O. at 528, 84 N.E.2d at 272. The *Bond Hill–Roselawn* court reasoned that church buildings often contain certain rooms that are not exclusively used for public worship—such as rooms used for cooking or for Boy Scout meetings—and that the existence of such rooms *within* a church building should not foreclose exemption of the building itself. *Id.* "Certainly it was not the intention of the people that their words 'used exclusively for public worship,' should be so literally construed that any such uses would prevent tax exemption of a church building." *Id.* at 73, 38 O.O. at 528, 84 N.E.2d at 272.

After *Bond Hill–Roselawn*, in *Bishop v. Kinney*, this court also granted the R.C. 5709.07 exemption to a parish hall that was used primarily for religious purposes but was also used occasionally for social gatherings and bingo games. 2 Ohio St.3d at 52–53, 2 OBR at 594–595, 442 N.E.2d at 765–766. In *Summit United Methodist Church*, on the other hand, this court upheld the BTA's denial of the exemption for the educational wing of a parish center that was used for

Sunday school but leased to the Ohio State University as a daycare center on weekdays.  7 Ohio St.3d at 15, 7 OBR at 407–408, 455 N.E.2d at 670–671.

The taxpayer in *Moraine Hts.* claimed that "although recreational activities are conducted to entertain the youth attending the camp, the primary use of the camp and its facilities is to create an atmosphere conducive to the worship of God. * * * [T]he camp-like environment promotes a better atmosphere to instill Christian principles." *Moraine Hts.*, 12 Ohio St.3d at 136, 12 OBR at 176, 465 N.E.2d at 1283.  Applying *Bond Hill–Roselawn*, *Bishop*, and *Summit United Methodist*, this court disagreed and affirmed the board's denial of the R.C. 5709.07 exemption.  *Id.* at 136, 12 OBR at 176–177, 465 N.E.2d at 1282–1283. The *Moraine Hts.* court conceded that the phrase "used exclusively for public worship" should not be so literally construed as to defeat exemption for multipurpose church buildings that may contain some rooms where nonreligious activities occur.  *Id.* at 136, 12 OBR at 176, 465 N.E.2d at 1282.  Even so, the *Moraine Hts.* court reasoned:

"The record demonstrates that of the forty-nine acres sought to be exempted, only the chapel is used primarily for public worship, and it has been exempted from taxation.  The balance of the land, including the lodging facilities, swimming pool, cafeteria, as well as the recreational and nature areas, are, at best, *merely supportive of appellant's goal to promote worship*." (Emphasis added.)  *Id.* at 136, 12 OBR at 177, 465 N.E.2d at 1283.

Accordingly, though *Moraine Hts.* does indeed stand for the proposition that the statutory qualifier "used exclusively" in the tax code should not be construed so strictly as to deny an exemption for every multipurpose church facility, the case still requires the taxpayer to meet a substantial burden in order to qualify for exemption.  The *Moraine Hts.* taxpayer's asserted uses of the facilities located on the property—to instill Christian values and create an atmosphere conducive to worship—though laudable, did not suffice to meet this burden.  The BTA drew a similar conclusion about True Christianity Evangelism's asserted uses of the property involved here, and for the foregoing reasons, it is a conclusion that I would uphold.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in the foregoing dissenting opinion.

———————

*Thompson Hine & Flory, L.L.P.*, and *Karen Kelly Grasso*, for appellant.

*Betty D. Montgomery*, Attorney General, and *Phyllis J. Shambaugh*, Assistant Attorney General, for appellee.

THE STATE OF OHIO, APPELLEE, *v.* COFFMAN, APPELLANT.

[Cite as *State v. Coffman* (2001), 91 Ohio St.3d 125.]

(Nos. 00–330 and 00–355—Submitted November
28, 2000—Decided March 7, 2001.)

FRANCIS E. SWEENEY, SR., J.   On October 21, 1997, the Delaware County Court of Common Pleas sentenced appellant, Dana E. Coffman, to a term of three to fifteen years for a robbery committed by appellant on April 6, 1996.   On July 20, 1999, appellant moved the trial court for shock probation pursuant to former R.C. 2947.061(B).[1]   The trial court denied appellant's motion.

Appellant appealed the trial court's decision to the Fifth District Court of Appeals.   The court of appeals dismissed the appeal on the ground that a trial court's denial of a motion for shock probation is not a final appealable order. Appellant then moved the court of appeals to certify a conflict.   On February 14, 2000, the court of appeals granted appellant's motion, certifying that its decision is in conflict with that of the Eighth Appellate District in *State v. Delaney* (1983),

---

1.  At the time of appellant's offense, R.C. 2947.061(B) provided:

   "Subject to sections 2951.02 to 2951.09 of the Revised Code and notwithstanding the expiration of the term of court during which the defendant was sentenced, the trial court, upon the motion of the defendant, may suspend the further execution of the defendant's sentence and place the defendant on probation upon the terms that, consistent with all required conditions of probation prescribed by division (C) of section 2951.02 of the Revised Code, the court determines, if the defendant was sentenced for an aggravated felony of the first, second, or third degree, is not serving a term of actual incarceration, is confined in a state correctional institution, and files the motion at any time after serving six months in the custody of the department of rehabilitation and correction."   146 Ohio Laws, Part I, 116–117.

9 Ohio App.3d 47, 9 OBR 50, 458 N.E.2d 462, the Second Appellate District in *State v. Brandon* (1993), 86 Ohio App.3d 671, 621 N.E.2d 776, the Fourth Appellate District in *State v. Riggs* (Oct. 4, 1993), Meigs App. Nos. 503 and 506, unreported, 1993 WL 405491, and the First Appellate District in *State v. Bauer* (Apr. 15, 1987), Hamilton App. No. C–860357, unreported, 1987 WL 9740.

The cause is now before this court upon our determination that a conflict exists (case No. 00–355) and upon our allowance of a discretionary appeal (case No. 00–330).

The court of appeals certified two related questions for our review and resolution. First, we are asked to decide whether the denial of a motion for shock probation pursuant to former R.C. 2947.061(B), 146 Ohio Laws, Part I, 116–117, can ever be a final appealable order. We are then asked to decide whether the denial of such a motion is a final appealable order only if the denial constitutes a constitutional or statutory violation. For the reasons that follow, we hold that a trial court's denial of a motion for shock probation is never a final appealable order.

The General Assembly repealed R.C. 2947.061—the shock probation statute—in Am.Sub.S.B. No. 2, 146 Ohio Laws, Part IV, 7136, 7809. However, because the provisions of Am.Sub.S.B. No. 2 apply only to offenses committed after July 1, 1996, former R.C. 2947.061 is available to those who, like appellant, committed their crimes prior to this date. *Id.* at 7810, Section 5.

Whether the denial of a motion for shock probation is a final appealable order is a question that has sharply divided the courts of appeals. Even among those courts of appeals that have held that the denial of such a motion is reviewable, the courts are divided over the extent of their appellate power. Some courts of appeals hold that a review can occur only when the trial court's denial constitutes a constitutional or statutory violation. See *Bauer*, 1987 WL 9740, and *Delaney*, 9 Ohio App.3d 47, 9 OBR 50, 458 N.E.2d 462, *supra*. Other courts hold that their appellate power is not limited to orders involving a constitutional or statutory violation. See *Brandon*, 86 Ohio App.3d 671, 621 N.E.2d 776, and *Riggs*, 1993 WL 405491, *supra*. Still other courts reject both viewpoints and hold that denials of motions for shock probation are never, under any circumstance, reviewable. See *State v. Poffenbaugh* (1968), 14 Ohio App.2d 59, 67, 43 O.O.2d 191, 196, 237 N.E.2d 147, 153; *State v. Coffman* (Dec. 29, 1999), Delaware App. No. 99CAA09044, unreported, 2000 WL 1406 (the instant case).

The Ohio Constitution confers upon appellate courts "such jurisdiction as may be provided by law to review and affirm, modify, or reverse judgments or final orders of the courts of record inferior to the court of appeals." Section 3(B)(2), Article IV, Ohio Constitution. R.C. 2505.02 sets forth those orders that are "final orders" subject to review by Ohio's appellate courts. Appellant contends that the

denial of a motion for shock probation falls under R.C. 2505.02(B)(2), which defines as a "final order" any order that "affects a substantial right made in a special proceeding."

Appellant correctly observes that the determination of a shock probation motion is a "special proceeding" inasmuch as shock probation was a purely statutory creation and was unavailable at common law. R.C. 2505.02(A)(2); see, also, *Bell v. Mt. Sinai Med. Ctr.* (1993), 67 Ohio St.3d 60, 63, 616 N.E.2d 181, 183; *State v. Jones* (1987), 40 Ohio App.3d 123, 124, 532 N.E.2d 153, 154. However, we disagree with appellant's contention that the denial of a motion for shock probation affects a "substantial right."

R.C. 2505.02(A)(1) defines a substantial right as "a right that the United States Constitution, the Ohio Constitution, a statute, the common law, or a rule of procedure entitles a person to enforce or protect." A substantial right is, in effect, a legal right that is enforced and protected by law. *Cleveland v. Trzebuckowski* (1999), 85 Ohio St.3d 524, 526, 709 N.E.2d 1148, 1150.

Former R.C. 2947.061(B) did not create a legal right to shock probation. Instead, the statute committed decisions regarding shock probation to the plenary discretion of the trial court that imposed the sentence. R.C. 2947.061(C) provided that "[t]he authority granted by this section shall be exercised by the judge who imposed the sentence for which the suspension is being considered." 146 Ohio Laws, Part I, 117. In deciding whether to grant or deny a motion for shock probation, this judge was given considerable discretion. R.C. 2947.061(B)'s terms were permissive in nature. R.C. 2947.061(B) provided, for example, that a trial court "may," upon the defendant's motion, suspend further execution of the sentence. *Id.* R.C. 2947.061(B) also permitted the trial court to impose its own terms upon the granting of shock probation and required only that the terms imposed by the trial court include the required conditions of probation prescribed by R.C. 2951.02(C). *Id.*

In matters of probation and parole, we have steadfastly refused to recognize a right of appeal absent a clear directive from the General Assembly that an appeal may be prosecuted. Our decision in *In re Varner* (1957), 166 Ohio St. 340, 2 O.O.2d 249, 142 N.E.2d 846, is instructive. In *Varner*, we reviewed a decision of the Pardon and Parole Commission, which found that the appellant in that case was a parole violator and which ordered that he be returned to prison. We were asked to decide whether this decision could be reviewed in a subsequent habeas corpus proceeding. The relevant statute in *Varner* was former R.C. 2965.21.[2]

---

2. As cited in *Varner*, R.C. 2965.21 provided:

"[A] prisoner who has been paroled, who in the judgment of the pardon and parole commission has violated the conditions of his * * * parole shall be declared a violator. * * * [T]he commission

We noted that this statute provided no apparent limitation on the authority and power of the Pardon and Parole Commission to declare a parolee a parole violator and to return him or her to prison. *Id.* at 346, 2 O.O.2d at 253, 142 N.E.2d at 850. Furthermore, the statute made no provision for appellate review. *Id.* at 347, 2 O.O.2d at 253, 142 N.E.2d at 851. Accordingly, we held that the Pardon and Parole Commission's decision to revoke appellant's parole and return him to prison was not reviewable. *Id.* at syllabus. In so holding, we concluded that under the law as it then existed, " 'the safeguard for the prisoner [was] in the conscientious, fairminded and humane viewpoint' " of the commission. *Id.* at 347, · 2 O.O.2d at 253, 142 N.E.2d at 851, quoting *Ex Parte Tischler* (1933), 127 Ohio St. 404, 411, 188 N.E. 730, 732.

Like the statute at issue in *Varner,* R.C. 2947.061(B) conferred substantial discretion while simultaneously making no provision for appellate review. In the absence of such an express provision, we can only conclude that a trial court's order denying shock probation pursuant to former R.C. 2947.061(B) is not a final appealable order.

Former R.C. 2947.061's scheme, including the absence of appellate review, was consistent with the fundamental principles underlying the concept of probation. Shock probation provided defendants with an opportunity to receive probation after they had spent a short period of time in a correctional facility. The theory underlying shock probation was that immersing a defendant in the penal system for a short period of time could "shock" him or her into a noncriminal lifestyle after probation. Campbell, Law of Sentencing (2 Ed.1991) 104.· Like other forms of probation, shock probation was in the nature of a privilege rather than a right or entitlement. As with any decision to award probation or suspend sentence, the decision to grant shock probation came as an act of grace to one convicted of a crime. *Escoe v. Zerbst* (1935), 295 U.S. 490, 492, 55 S.Ct. 818, 819, 79 L.Ed. 1566, 1568; *Varner,* 166 Ohio St. at 343, 2 O.O.2d at 252, 142 N.E.2d at 849. That the General Assembly chose to place this decision within the plenary discretion of the sentencing court is not surprising. Probation has always been viewed as a matter that lies within the judgment of the trial judge. See *State v. Theisen* (1957), 167 Ohio St. 119, 124, 4 O.O.2d 122, 125, 146 N.E.2d 865, 869.

While we recognize that appellate review is an important procedural safeguard for the rights of defendants, it must be kept in mind that by the time defendants move the sentencing court for shock probation, many procedural safeguards have already been afforded to them. They have been seized in a constitutional manner, confronted by their accusers and the witnesses against them, and tried

---

shall determine whether such * * * person shall be released upon the same conditions as the original parole or paroled upon different conditions or shall be imprisoned in a penal or reformatory institution." 1953 H.B. No. 1.

before a jury of their peers, convicted, and sentenced to punishment. *Varner,* 166 Ohio St. at 344, 2 O.O.2d at 252, 142 N.E.2d at 849. From this conviction, defendants have had a specific right of appeal. *Theisen,* 167 Ohio St. at 124, 4 O.O.2d at 125, 146 N.E.2d at 869.

The kinds of procedural safeguards available to a defendant after conviction depend upon the nature of the private interest at stake. Because under former R.C. 2947.061(B) the defendant's interest does not rise to the level of a substantial right, the defendant's safeguards are found not in further appellate review, but rather in the trial judge's sworn obligation to uphold the law and apply it with impartiality. See R.C. 3.23. We are confident that, in reviewing motions for shock probation, the trial courts have carried out their duties under the law with a "conscientious, fairminded and humane viewpoint," *Varner,* 166 Ohio St. at 347, 2 O.O.2d at 253, 142 N.E.2d at 851, and will continue to do so with respect to any future motions brought under former R.C. 2947.061(B).

Finally, we reject the view that the denial of a motion for shock probation should be reviewable as a final appealable order if it constitutes a constitutional or statutory violation. See *Bauer,* 1987 WL 9740, and *Delaney,* 9 Ohio App.3d 47, 9 OBR 50, 458 N.E.2d 462. The logic underlying this view is circular. Whether the trial court violated some constitutional or statutory standard in denying a motion for shock probation can only be determined through a review of the trial court's decision. However, once the appellate court agrees to conduct this review, it has already treated the trial court's decision as a final appealable order. Thus, the appellate court has implicitly determined that the trial court's decision is a final appealable order before it even begins to review the decision for constitutional and statutory violations.

As the Second Appellate District recognized in *Brandon,* 86 Ohio App.3d 671, 621 N.E.2d 776, to hold that a trial court's order denying shock probation is reviewable if there is a constitutional or statutory violation begs the question. A trial court's order denying shock probation is either reviewable or it is not reviewable. *Id.* at 676, 621 N.E.2d at 779. We cannot hold that this order is sometimes reviewable and sometimes not. *Id.*

For the foregoing reasons, we conclude that a trial court's order denying shock probation pursuant to former R.C. 2947.061(B) is not a final appealable order regardless of whether the denial constitutes a constitutional or statutory violation. Accordingly, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

RESNICK, COOK and LUNDBERG STRATTON, JJ., concur.

COOK, J., concurs separately.

MOYER, C.J., DOUGLAS and PFEIFER, JJ., dissent.

---

---

*W. Duncan Whitney,* Delaware County Prosecuting Attorney, and *Rosemary E. Rupert,* Assistant Prosecuting Attorney, for appellee.

*David H. Bodiker,* Ohio Public Defender, and *Theresa G. Haire,* Assistant Public Defender, for appellant.