CHICAGO FIRE FIGHTERS UNION LOCAL No. 2, Plaintiff-Appellee, v. THE CITY OF CHICAGO, Defendant-Appellant.

First District (6th Division)   No. 1—99—2647

Opinion filed June 1, 2001.

Mara S. Georges, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Mardell Nereim, Assistant Corporation Counsel, of counsel), for appellant.

Sugarman & Horwitz, of Chicago (Robert S. Sugarman and Stephen B. Horwitz, of counsel), for appellee.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

This appeal arises out of the discharge or suspension of 28 employees of the Chicago Fire Department (CFD), by respondent, the City of Chicago, (the City), as a result of their participation in an unauthorized retirement party at a Chicago firehouse. Petitioners, the Chicago Fire Fighters Union Local No. 2 (the Union), grieved the discipline, and an arbitrator held the discharges and disciplinary suspensions untimely, thereby reinstating the employees to their respective positions and vacating the disciplinary actions. The Union then initiated an action to enforce an arbitration award issued pursuant to section 11 of the Uniform Arbitration Act (710 ILCS 5/11 (West 1998)). The City filed a counterpetition to vacate the arbitration award. After considering cross-motions for summary judgment, the circuit court of Cook County entered an order granting the Union's motion and denying that of the City. On appeal, the City contends that the arbitration

award should be vacated as against public policy. For the following reasons, we vacate the order entered below, and reverse and remand this matter for further proceedings consistent with this opinion.[1]

## BACKGROUND

The following facts are relevant to this appeal. In May 1997, CFD internal affairs division (IAD) executive assistant Mark Edinburg learned of the existence of a videotape of an unauthorized retirement party held on April 12, 1990, at the CFD firehouse known as Engine 100. The videotape depicted firefighters drinking alcoholic beverages inside the firehouse; leaving the firehouse in fire trucks to respond to fire calls; some participants making offensive racial, gender and ethnic slurs; and some engaging in other conduct such as exposing their bare buttocks and genitals. Edinburg viewed the videotape on May 9, 1997. On May 13, 1997, Edinburg advised Edward F. Altman, the IAD director, of the existence of the videotape via memorandum. Altman did not notify his superiors of the existence of the videotape until late November 1997, after Altman learned that a local television news reporter had obtained a copy of the videotape. At that time, the CFD and the City commenced the disciplinary investigation process.

In early December 1997, the City filed charges against the 28 employees who participated in the videotaped party. Following an investigation conducted by Inspector General Alexander Vroustouris, discipline was imposed on the employees in May 1998. The disciplinary actions consisted of the discharge of seven employees and suspensions ranging from 6 to 60 days for the remaining employees.

On February 10, 1998, Altman was also charged with misconduct for failing to open an investigation after learning of the videotape and failing to apprise his superiors of the existence of the videotape. By letter dated February 25, 1998, Altman was separated from his position as director of IAD.

---

[1]We filed our original opinion in this matter on August 11, 2000. The Union filed a petition for leave to appeal in the Illinois Supreme Court, which was denied. On November 29, 2000, the supreme court allowed the motion of the Union for reconsideration of denial of the petition for leave to appeal, and vacated the order denying the petition for leave to appeal. Subsequently, on December 28, 2000, the supreme court issued supervisory order number 90217, denying the Union's petition for leave to appeal, vacating our original opinion and remanding this cause to this court for reconsideration in light of the United States Supreme Court case *Eastern Associated Coal Corp. v. United Mine Workers of America, District 17*, 531 U.S. 57, 148 L. Ed. 2d 354, 121 S. Ct. 462 (2000). We issue this opinion as directed, upon reinstatement of the appeal, and reconsideration of the specific and relevant issue raised in the aforementioned case (see Part III, *infra.*)

Pursuant to the collective bargaining agreement (Agreement) between the City and the Union, the Union filed grievances on behalf of the 28 disciplined CFD employees. An arbitration hearing commenced before arbitrator Edwin H. Benn on October 2, 1998. The arbitration proceedings were limited to the threshold question as follows:

"Whether the investigation of the alleged April 12, 1990 incident at Engine 100's quarters and/or the discipline imposed regarding such incident was or were untimely, that the discipline cannot stand[.] If so, what is the appropriate remedy?"

The text of the opinion and award includes Benn's comment in a footnote:

"The videotape was received in evidence over the Union's objection. By receipt to the tape in evidence, I do not find at this time that the named Grievants engaged in the conduct or to the degree attributed to them by the charges in this case. The videotape was received for the limited purpose of showing that it was the basis used by the City to impose discipline."

Arbitrator Benn issued his opinion and award on December 30, 1998, finding that the disciplinary action was invalid as untimely, pursuant to section 16.2(E) of the Agreement. Section 16.2(E) provides in pertinent part as follows:

"The Employer shall conduct disciplinary investigations when it receives complaints or has reason to believe an employee has failed to fulfill his responsibilities as an employee and just cause for discipline exists."

Benn found that pursuant to section 16.2(E), the City was required to have begun a disciplinary investigation "at the time" it learned of the alleged misconduct, and that a 6½-month delay in the commencement of the disciplinary investigative process "was far beyond any reasonable time period allowed."

Next, as stipulated by the parties, Benn determined the appropriate remedy pursuant to section 16.2C of the Agreement, which provides:

"Any employee found to be unjustly suspended or discharged shall be reinstated with full compensation for all lost time and with full restoration of all other right, benefits and conditions of employment, without prejudice, unless a lesser remedy is agreed upon as a grievance settlement or deemed appropriate by an arbitrator."

Benn concluded that the disciplinary actions shall be rescinded:

"Those employees discharged shall be reinstated to their former positions without loss of seniority rights, benefits and conditions of employment, without prejudice. All affected employees shall have their records cleared of references to discipline stemming from the April, 1990 party. All affected employees shall be made whole for lost wages and benefits and in all other respects."

After setting forth the award, Benn noted that he was required by *American Federation of State, County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299, 671 N.E.2d 668 (1996), to take precautionary steps to ensure the misconduct at issue would not be repeated and to take into consideration pertinent public policy concerns. Benn stated:

"As I view the evidence before me, I am satisfied, and I find, that the public can be assured that the alleged misconduct will not be repeated by Grievants and that steps have been or can be taken to ensure that result.

Taken at its worst, the alleged misconduct in this case shows that eight years before they were disciplined, Grievants, in varying degrees, consumed alcohol in a firehouse against regulations (and with the implication that the citizens of the community served by Engine 100 did not have at their disposal the services of a full complement of unencumbered firefighters); some made racial, gender and ethnic offensive comments; and some engaged in boorish exhibitionist conduct. Those are troubling and serious allegations and the implications of that conduct have a profound impact on the citizens of the City. However, I am satisfied that the alleged misconduct will not happen again from these Grievants.

First, I must consider the nature of the involved employees. For the most part, Grievants are *very long* term employees, some having over 25 years of service with the City. Since the incident, a number of Grievants have been promoted to Engineer, Lieutenant, Captain, or Battalion Chief indicating their competence and capabilities as members of the Department. Since the incident, a number of Grievants have received commendations for their service and have saved lives and protected property of the citizens of Chicago. The parties agreed that there has been no pertinent discipline for Grievants prior to April 12, 1990 (with the exception of an oral reprimand). [Citation.] With the exception of the alleged misconduct which occurred on one day some eight years before they were actually disciplined, Grievants' records show them to be exceptional employees and they have not engaged in similar misconduct (or for that matter, for all purposes, any misconduct) during that lengthy period of time.

Second, I also have to consider the nature of Grievants' work. They are firefighters. As such, Grievants routinely risk their lives to save the lives and protect the property of others. They have been trained at considerable public expense and have amassed considerable experience at performing their craft. Particularly with respect to those discharged, the public loses when those long term and experienced employees are no longer permitted to use their train-

ing and experience for the safety and protection of the citizens of the City.

Third, the fact that the City moved to take very strong disciplinary action against Grievants is a clear and unambiguous statement to Grievants that they will be disciplined to the fullest extent should they engage in such conduct in the future. Given the high quality of employees involved in this case, I am satisfied that message will be heeded.

Fourth, this case has received extensive publicity—locally and nationally—and I suspect that the publicity will probably now continue. Given the nature of some of the misconduct involved in this dispute, to be part of that kind of publicity must be a damning public embarrassment to these Grievants. Again, the strong message has been sent to Grievants of the consequences of this type of conduct and the need that it never again be repeated.

Fifth, the City has already put in place mechanisms to prevent such conduct from occurring in the future. In Department Memo M—39—37 dated December 8, 1997 which issued as a result of the alleged misconduct in this case, the Fire Commissioner ordered all Department members to re-familiarize themselves with the orders prohibiting substance abuse and discrimination and sexual harassment; advised the employees that violations of those orders will not be tolerated and that discipline for such violations will be taken; and that management changes were put in place to ensure strict compliance with the Department's Code of Conduct. If anything is not crystal clear, the Department's stance on the kind of party and conduct which occurred on April 12, 1990 is now known—it will *not* be tolerated.

Sixth, with respect to the alleged racial, gender and ethnic offensive comments made by some one [sic] the videotape, if the City is of the opinion that such views still exist within the ranks of Department, it is free within the scope of its managerial prerogatives and the terms of Agreement to train and repeatedly retrain its members as a whole that such conduct has absolutely no place in the workplace. If that training does not work, the City is free to take strong and swift disciplinary action. The City has within its control powerful mechanisms to make certain that Grievants do not engage in this kind of conduct in the future.

In sum then, I am satisfied—and I find—that Grievants are capable of rehabilitation; that the conduct allegedly engaged in by Grievants will not reoccur; and that steps have been taken and can be taken to assure the public of that result." (Emphasis in original.)

The Union filed a petition to enforce the arbitration award in the circuit court, and the City filed a counterpetition to vacate the arbitra-

tion award. The parties filed cross-motions for summary judgment. In its motion, the City argued that the arbitrator had exceeded his authority and that the award violated public policy.

On June 22, 1999, the circuit court granted the Union's petition to enforce the award and denied the City's counterpetition to vacate the award. The circuit court found that the City was estopped from raising public policy as a ground for vacating the award because it had agreed to submit the question of timeliness and the issue of the remedy to the arbitrator. The City filed a timely appeal from the order of the circuit court.

## OPINION

This matter calls upon the court to address a serious matter of public policy affecting the health, safety and welfare of the citizens of the City of Chicago. On appeal, the City contends that the trial court erred in refusing to consider public policy as a ground for vacating the arbitration award entered in favor of the Union. The City argues that the award violates the public policy favoring a safe and effective fire prevention system. We agree.

### I. Standard of Review

●1 We acknowledge that judicial review of an arbitral award is extremely limited. *American Federation of State, County & Municipal Employees v. State of Illinois*, 124 Ill. 2d 246, 254, 529 N.E.2d 534 (1988) (hereafter *AFSCME I*); *Board of Trustees of Community College District No. 508, County of Cook v. Cook County College Teachers Union, Local 1600*, 74 Ill. 2d 412, 418, 386 N.E.2d 47 (1979). This standard reflects the legislature's intent in enacting the Illinois Uniform Arbitration Act, that is, to provide finality for labor disputes submitted to arbitration. See 710 ILCS 5/12 (West 1994) (denying judicial authority to vacate arbitral awards except on grounds recognized at common law). The Uniform Arbitration Act contemplates judicial disturbance of an award only in instances of fraud, corruption, partiality, misconduct, mistake, or failure to submit the question to arbitration. *Board of Education v. Chicago Teachers Union, Local No. 1*, 86 Ill. 2d 469, 474, 427 N.E.2d 1199 (1981). Thus, a court of review must enforce a labor-arbitration award if the arbitrator acts within the scope of his or her authority and the award draws its essence from the parties' collective-bargaining agreement. *American Federation of State, County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299, 305, 671 N.E.2d 668 (1996) (hereafter *AFSCME II*).

However, even if the arbitrator makes his award within the scope of his authority and the award is based on the arbitrator's interpreta-

tion of the agreement, we will vacate the award if it is repugnant to the established norms of public policy. *AFSCME I*, 124 Ill. 2d at 254; *County of De Witt v. American Federation of State, County & Municipal Employees, Council 31*, 298 Ill. App. 3d 634, 637, 699 N.E.2d 163 (1998).

## II. Waiver

In the present case, the trial court held that the City was "estopped" from raising a public policy defense because the parties stipulated to submit to the arbitrator only the issue of the timeliness of the discipline and the fashioning of the appropriate remedy. Thus, on appeal, the Union contends that the City "waived" its right to condemn the award as violative of public policy.

•2 The Union's contention is unsupported by either the record or controlling authority. Questions of public policy are left to the courts, not the arbitrator. On review, this court is not bound by the arbitrator's consideration of public policy and we may not abdicate to the arbitrator our responsibility to protect the public interest at stake. *Board of Trustees*, 74 Ill. 2d at 424. "Questions of public policy *** are ultimately left for resolution by the courts." *AFSCME II*, 173 Ill. 2d at 318.

The authority relied upon by the Union in support of its argument for waiver is distinguishable. For example, in *Board of Education v. Illinois Educational Labor Relations Board*, 289 Ill. App. 3d 1019, 682 N.E.2d 398 (1997), the Board of Education (Board) terminated a teacher for unsatisfactory performance. The Chicago Teachers Union (CTU) filed a grievance on behalf of the teacher, arguing that the Board violated the collective bargaining agreement by evaluating the teacher's performance according to the incorrect procedures for tenured teachers. The grievance went to arbitration, and the arbitrator issued a final and binding award in favor of the CTU, ordering reinstatement of the teacher. The Board, however, failed to both comply with the arbitrator's award and to file any timely exceptions to the award. After the deadline for the filing of exceptions passed, the Board filed exceptions to the ALJ's original decision, arguing that the decision was against the public policy of providing a quality public education. The IELRB issued its opinion holding that the original decision by the ALJ was final and binding. *Board of Education*, 289 Ill. App. 3d at 1023.

On appeal, this court held that the Board's failure to file timely exceptions to the original decision of the ALJ constituted waiver of its right to contest the propriety of that decision. This court found the public policy concerns "radically different" from those implicated in

*AFSCME II* (see discussion *infra)* and not controlling of the facts presented in the Board's appeal. *Board of Education,* 289 Ill. App. 3d at 1022.

●3 By contrast, in the present case, the issue of public policy was properly before the arbitrator. The record shows that the arbitrator not only acknowledged the implication of public policy concerns, but went to great lengths in his opinion and order to address those concerns, ultimately concluding that public policy was not adversely affected by his decision to reinstate the 28 firefighters.

An agreement to submit to arbitration does not operate as a device or structure to circumvent questions of public policy, especially where, as here, the Union initiated an action in court to enforce the arbitration award. We therefore find erroneous the trial court's determination that the City was foreclosed from challenging the award as against public policy upon review in the circuit court.

### III. Public Policy Exception

●4 In order to vacate an award under the "public policy exception," we are required to undertake a two-step analysis. First, we inquire whether a well-defined and dominant public policy can be identified. If so, we must then determine whether the arbitrator's award, as reflected in his interpretation of the agreement, violated the public policy. To ascertain the existence of public policy, we look to our constitution, statutes and relevant judicial opinions. *AFSCME II,* 173 Ill. 2d at 308; *De Witt,* 298 Ill. App. 3d at 637.

●5 As to the first inquiry, it is unquestionable that an established public policy exists in Illinois favoring safe and effective fire protection services. The Illinois legislature specifically created fire protection districts in 1871 (1871-72 Ill. Laws 218, art. V (as renumbered) § 64), and codified fire protection districts with the creation of the Fire Protection District Act (the Act) in 1927 (1927 Ill. Laws 530, § 1; Ill. Rev. Stat. 1929, ch. 127$\frac{1}{2}$, par. 31[2]). The Act pronounces that fire protection districts are fundamentally created "as a matter of legislative determination *** in order to promote and protect the health, safety, welfare and convenience of the public," and in the "public interest *** [to] provide as nearly adequate protection from fire for lives and property within the districts as possible and regulate the prevention and control of fire therein." 70 ILCS 705/1 (West 1998) (formerly Ill. Rev. Stat 1991, ch. 127$\frac{1}{2}$, par. 21).

---

[2]"The maintenance of fire departments is the exercise of the police power delegated by the State for the benefit of the public generally" "for the safety, health and general welfare of the public." *People ex rel. City of Chicago v. Commercial Union Fire Insurance Co.,* 322 Ill. 326, 333, 153 N.E. 488 (1926).

Further evidence of the public policy of protecting the public from fire can be found in section 11 of the Act, which provides for lifesaving and rescue equipment, emergency ambulance services and facilities in furtherance of the "declared *** matter of public policy" "to preserve, protect and promote the public health, safety and general welfare." 70 ILCS 705/22 (West 1998).[3] Additional examples of our legislature's intent to promote fire safety is evidenced by other statutes, including the Illinois Fire Protection Training Act (50 ILCS 740/1 *et seq.* (West 1998)), which requires advanced training of fire department protection personnel "in order to promote and protect the health, safety, and welfare of the public." (50 ILCS 740/1 (West 1998)); as well as the entirety of chapter 425 of the Illinois Compiled Statutes entitled: "Fire Safety," which includes acts requiring smoke detectors in such public facilities as nursing homes, child care facilities, and community residential alternative homes (Facilities Requiring Smoke Detectors Act" (425 ILCS 10/0.01 *et seq.* (West 1998)); the Forest Fire Protection District Act (425 ILCS 40/0.01 *et seq.* (West 1998)), designed for the prevention and suppression of forest fires and which also incorporates criminal penalties for violation thereof; and acts regulating fireworks (425 ILCS 30/1 *et seq.*, 35/0.01 *et seq.* (West 1998)), furniture fire safety (425 ILCS 45/1001 *et seq.* (West 1998)), fire escapes (425 ILCS 15/0.01 *et seq.* (West 1998)), and space heating (425 ILCS 65/1 *et seq.* (West 1998)).

Having identified a well-defined public policy favoring safe and effective fire prevention services, we next turn our attention to the question of whether the arbitrator's award violated that public policy.

Here, the arbitrator interpreted the Agreement to hold that a 6$\frac{1}{2}$-month delay in instituting disciplinary action against the 28 firefighters was in contravention of the provision of the Agreement which required that the offending firefighter be notified of disciplinary action "when" the department became aware of the alleged infraction or, specifically, in the words of the arbitrator, "at the time" the department learned of the alleged misconduct. However, the Agreement contains no explicit provision detailing that investigations of infractions of CFD rules begin within any specific time period.

---

[3]In furtherance of the public policy favoring safe and effective ambulance and emergency medical services, the legislature also enacted the Emergency Medical Services (EMS) Systems Act (210 ILCS 50/1 *et seq.* (West 1998)), which, *inter alia*, sets forth three levels of EMS and the corresponding training and skill levels required to be met by EMS technicians and paramedics. See, *e.g., City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 692 N.E.2d 295 (1998).

In *AFSCME II*, our supreme court refuted a similar interpretation of a timeliness provision in a collective bargaining agreement regarding the institution of a disciplinary action. The facts in that case are as follows: In August 1990, the Department of Children and Family Services (DCFS) learned that a worker had filed a false report about the progress of children in the DCFS system. In her report, submitted in February 1990, the worker stated that the children were "doing fine," when they had in fact perished in a fire in January 1990. Investigators completed a written report against the worker on December 13, 1990; however, no further disciplinary action was taken against the worker for 7½ months, until June 20, 1991. The Union, AFSCME, intervened arguing that under the collective bargaining agreement (CBA), disciplinary action could not be taken against the worker in view of the "extreme time delay." After arbitration, the arbitrator concluded that the DCFS' failure to impose discipline in a timely fashion according to the CBA prevented him from reaching the merits of the dispute. The CBA provided in pertinent part:

"Discipline shall be imposed as soon as possible after the Employer is aware of the event or action giving rise to the discipline and has a reasonable period or time to investigate the matter.

In any event, the actual date upon which discipline commences may not exceed forty five (45) days after the completion of the predisciplinary meeting." (Emphasis omitted.) 173 Ill. 2d at 305.

The arbitrator ordered the worker reinstated.

The State appealed, and the circuit court held that reinstatement violated public policy and remanded the matter to the arbitrator for a decision on the merits. The arbitrator refused to hear the merits of the case, however, after AFSCME "demurred," electing to stand on the arbitrator's initial decision. AFSCME filed a petition in the circuit court, seeking to confirm the arbitrator's initial award, which was denied by the circuit court. On appeal, the appellate court reversed, holding that the time provisions contained in the CBA could not be relaxed in favor of public policy. *AFSCME II*, 173 Ill. 2d at 303, citing *American Federation of State, County & Municipal Employees v. Department of Central Managment Services*, 272 Ill. App. 3d 814, 818, 651 N.E.2d 718 (1995).

Our supreme court reversed. In determining that reinstatement of the worker violated public policy, in that it totally ignored any of the legitimate public policy concerns charging a state agency and its employees "with particular responsibilities which represent the will of the public with respect to the welfare and protection of children," the court held:

"In certain cases, interpreting the time provisions as the arbitrator

did in this case and ordering reinstatement will not contravene the public policy enunciated above. *** However, the manner in which the time provision was enforced in this case with respect to the misconduct at issue cannot be upheld. As with any limitation, the nature of the conduct at issue must be considered before arbitrary time restrictions can be imposed." *AFSCME II*, 173 Ill. 2d at 317.

Here, as in *AFSCME II*, the Union argues that the award of reinstatement of the 28 firefighters does not violate public policy. The Union argues that the arbitrator strictly followed the guidelines set forth in *AFSCME II* for reinstatement through his six-part "rehabilitation" analysis, at the end of which he concluded that the firefighters were unlikely to repeat their offensive conduct in the future.

However, the City found enough reason, after considering the activities of the individuals on the videotape, to discharge 7 employees and suspend 21 employees. The City also found it appropriate to "separate" Altman from his position as director of the IAD.

Here, public policy considerations regarding the health, safety and welfare of the public regarding its fire prevention services mitigate against *inappropriate* remedies for violation of CFD rules:

" 'As long as the arbitrator's remedy is "rationally explainable as a logical means of furthering the aims of the contract" [citation], the arbitrator may for example, impose monetary penalties, order the [employer] to reimburse the employee for rehabilitation programs, *order reinstatement of the employee to a position in which he poses no danger to the public,* or create its own unique sanction to deter overreaching by the employer.' " (Emphasis added.) *AFSCME II*, 173 Ill. 2d at 322, quoting *Union Pacific R.R. Co. v. United Transportation Union*, 3 F. 3d 255, 263 (8th Cir. 1993).

In *De Witt*,[4] this court examined an arbitration award which reinstated a county nursing home employee who had been discharged for striking an elderly resident. The arbitrator in that case had interpreted the relevant collective bargaining agreement to hold that one incident of striking, which resulted in "no apparent injury," did not amount to "resident abuse" and that the employee could not be terminated for that single offense. *De Witt*, 298 Ill. App. 3d at 638. This court reversed the arbitrator, holding that the arbitrator's "one free hit" rule violated the established public policy of protecting senior citizens from abusive and degrading treatment:

"When a nursing home employee lashes out in frustration or anger and strikes a resident, it is small comfort that it happened only

---

[4]We find *De Witt* pertinent to the disposition of this appeal, despite the fact that it was cited in a mere footnote in the Union's brief and only touched upon briefly by the City in its reply brief.

once or that the hit did not create a visible injury. Such an incident is degrading and an example of the type of behavior the legislature addressed when it enacted the Nursing Home Care Act and the Elder Abuse and Neglect Act. We believe the public policy of this state does not tolerate *any* incidents of abuse upon the elderly, no matter now infrequent or mild. Therefore, we cannot recognize or enforce an interpretation of a contract that prevents an employer from responding to such behavior." *De Witt*, 298 Ill. App. 3d at 638.

The record shows that the arbitrator cited six reasons why he was assured that employees posed no further danger to the public *without ever considering the merits of the case*. Although the order recited that the arbitrator viewed the videotape, the arbitrator specifically stated that it was for the "limited purpose of showing that it was the basis used by the City to impose discipline." Without considering the conduct contained in the videotape for evidentiary purposes, the arbitrator was unable to fashion an appropriate award. Failure to consider the merits of the allegations ignores the seriousness of any possible lack of readiness of municipal firefighters who are on call 24 hours a day to respond to emergency situations within a few scant minutes. It cannot be doubted that firefighters who are ill-equipped to adequately perform their ascribed duties as the result of a state of intoxication including, but not limited to, the operation of any kind of vehicle, may have a substantial, detrimental impact on the health and safety of the citizens of the City of Chicago.

•6 The record, in fact, belies the arbitrator's conclusions. Transcripts of interviews of the firefighters conducted by the City's inspector general reveal that some of the firefighters deny any wrongdoing by their conduct. Several firefighters interviewed denied any knowledge of CFD rules and regulations, *e.g.*, General Order No. 87—008, dated February 1, 1987, that prohibited firefighters from consuming alcohol while on duty. One lieutenant on duty at Engine 100 on the day of the party acknowledged that there was a "keg" in the firehouse, and although he claimed to have no knowledge of the contents of the keg, he made a statement to another firefighter that "we have to get rid of it," and that he "wanted it out of the firehouse." At the same time, this lieutenant testified that he neither observed any infractions of CFD rules nor did he report any misconduct on the part of any fire department employees. A lieutenant from another company who attended the party with his crew testified that, in his opinion, the party did not violate any CFD rules and regulations "according to what's been tradition on our job for a good many years."

Nevertheless, the arbitrator ordered complete reinstatement of employment and benefits to each individual disciplined by the depart-

ment. The order of the arbitrator fails to show that any precautionary steps were taken to deter any future misconduct or to ensure that it would not be repeated. The arbitrator merely concluded, based on his own assumptions, that the firefighters would fail to engage in any offensive activities in the future. The arbitrator held no hearing whatsoever on the merits of the alleged infractions committed by the 28 firefighters, and failed to consider any evidence that the firefighters took responsibility in any way for the conduct they engaged in and the charges leveled against them. The arbitrator's award fails to promote the safety and welfare of the public in direct contravention of well-established public policy. We cannot say that the arbitrator was either within his authority in making a determination of timeliness based on the Agreement or that he was able to make a "rational" finding that the employees could be trusted to refrain from the offending conduct in the future:

> "[W]hen public policy is at issue, it is the court's responsibility to protect the public interest at stake. That is why courts will not give the drunken pilot the opportunity to fly a commercial airliner again even though no harm befell his passengers." *AFSCME II*, 173 Ill. 2d 333.

Under the circumstances of this case, the petition for relief granted by the arbitrator in favor of the Union and upheld on review in the circuit court is hereby vacated, and we remand this matter for a hearing on the merits of the allegations in accordance with the provisions of the collective bargaining agreement.

## II

## RECONSIDERATION UPON REMAND

We reconsider this matter, our original opinion having been vacated and the matter remanded to this court by the Illinois Supreme Court. Upon reconsideration, this court entered an order granting the parties leave to file supplemental briefs confined solely to the following issue addressed in the United States Supreme Court case of *Eastern Associated Coal Corp. v. United Mine Workers of America, District 17*, 531 U.S. 57, 148 L. Ed. 2d 354, 121 S. Ct. 462 (2000): "whether there exists an explicit, well-defined, dominant public policy to which the arbitrator's decision ran contrary," and to address what bearing, if any, the decision in *Eastern* has on the present case.

In *Eastern*, a labor arbitrator ordered an employer to reinstate an employee truck driver who had twice tested positive for marijuana. The question before the Supreme Court was whether considerations of public policy required the lower court to refuse to enforce the arbitration award:

"[T]he question to be answered is not whether Smith's drug use itself violates pubic policy, but whether the agreement to reinstate him does so. To put the question more specifically, does a contractual agreement to reinstate Smith with specified conditions *** run contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests?" *Eastern,* 531 U.S. at 62-63, 148 L. Ed. 2d at 361, 121 S. Ct. at 467.

The Supreme Court upheld the award of the arbitrator, finding that there was no explicit, well-defined or dominant public policy to which the arbitrator's decision was contrary. In doing so, the Supreme Court noted that the activities of truck drivers are governed by the Omnibus Transportation Employee Testing Act of 1991 (49 U.S.C. § 31306(b)(1)(A) (1994)) (Testing Act), and the United States Department of Transportation's implementing regulations by the Secretary of Transportation (49 C.F.R. § 382.605 (1999)). The Court noted that the remedial aims of the Act are complex, including a Testing Act policy favoring rehabilitation of employees who use drugs:

"Neither Congress nor the Secretary has seen fit to mandate the discharge of a worker who twice tests positive for drugs. We hesitate to infer a public policy in this area that goes beyond the careful and detailed scheme Congress and the Secretary have created." *Eastern,* 531 U.S. at 67, 148 L. Ed. 2d at 364, 121 S. Ct. at 469.

The Union cites as additional support the Ohio case *Southwest Ohio Regional Transit Authority v. Amalgamated Transit Union, Local 627,* 91 Ohio St. 3d 108, 742 N.E.2d 630 (2001). There, the employer, a mass transit system, established a "zero tolerance" drug-and-alcohol-prevention policy which subjected "safety sensitive" employees to random drug-testing with termination of employment mandated upon a positive test. The Union filed a grievance on behalf of a bus repairperson, who was classified as a "safety sensitive" employee. The arbitration panel found that the policy was facially valid and that testing positive was a dischargeable offense, but that the automatic discharge provision conflicted with, and therefore violated the "sufficient cause" discharge provision of, the collective bargaining agreement, and ordered the employee reinstated. The award was confirmed by the court of common pleas. On appeal, however, the award was reversed. The Ohio appeals court held that reinstating the employee violated the "explicit, well-defined and dominant public policy to ensure the safety of the passengers of common carriers and the general public by suppressing illegal drug use among transportation employees." 91 Ohio St. 3d at 109, 742 N.E.2d at 632. However, upon review, the Ohio Supreme Court held that Ohio has no dominant

and well-defined public policy that renders unlawful an arbitration award reinstating a safety-sensitive employee who was terminated for testing positive for a controlled substance. The court held that while the drug policy established by the employer was facially valid, the employer did not have the right to unilaterally adopt a policy of automatic termination without the possibility of reinstatement as a sanction for testing positive for drugs because such a sanction conflicts with the "sufficient cause" requirement for dismissal found in the collective bargaining agreement. This Ohio case is distinguishable from the present case: as continuously noted in the body of our opinion, there is no absence of a well-defined, explicit public policy here.

Here, the Union argues that *Eastern* dictates that whether the reinstatement of the firefighters violates public policy is to be "ascertained by reference to positive law," and where the "award violates no specific provision of any law or regulation," it is to be enforced. The Union argues that the collective bargaining agreement does not preclude the actions of the arbitrator here and urges this court to focus on the "legality of the action ordered by the arbitrator, not on the recognized violation of the grievant." At the same time, the Union recognizes that *Eastern* is not binding on the present case.

As the City responds, even focusing on the decision of the arbitrator, nothing in *Eastern* undermines the decision of this court. The question is not whether the award is consistent with the collective bargaining agreement, but whether the agreement, as interpreted by the arbitrator, is consistent with public policy. *Eastern*, 531 U.S. at 61-62, 148 L. Ed. 2d at 360-61, 121 S. Ct. at 466-67; *AFSCME II*, 173 Ill. 2d at 307. Here, the arbitrator's award reinstating the discharged firefighters violates the well-established public policy favoring safe and effective fire prevention services in the critical matter of public safety. See, *e.g. Illinois Nurses Ass'n v. Board of Trustees of the University of Illinois*, 318 Ill. App. 3d 519 (2000). The conduct at issue in the present case was recorded on videotape and reveals public safety workers in an on-going state of intoxication, some participants setting about to perform their duties by way of responding to an alarm for a fire. Nevertheless, the arbitrator ordered reinstatement and barred all discipline and sanctions without considering the merits of the case. Firefighters have the extraordinary responsibility for carrying out the well-stated public policy of safe and effective fire prevention. Firefighters must be prepared to respond immediately to emergency conditions at all times, and in all weather conditions, whenever the alarm bell in the firehouse sounds. For these reasons, and for all of the reasons

cited by our supreme court in *AFCSME II*, 173 Ill. 2d 299, we adhere to our original opinion as set forth above.

Vacated; reversed and remanded with instructions.

BUCKLEY and O'BRIEN, JJ.,[5] concur.

---

[5]Justice Sheila M. O'Brien is substituting for Justice Morton Zwick, who is no longer a member of the court.