2021 IL App (1st) 201237

SIXTH DIVISION
November 19, 2021

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-20-1237

| | | |
|---|---|---|
| | ) | |
| MARK MUNIZZI, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CH 14398. |
| | ) | |
| UBS FINANCIAL SERVICES, INC., | ) | Honorable |
| | ) | Caroline Kate Moreland, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Oden Johnson concurred in the judgment and opinion.

**OPINION**

¶ 1    The circuit court in this case confirmed an arbitration award in favor of plaintiff Mark Munizzi and against defendant UBS Financial Services, Inc. (UBS). After two UBS accounts suffered significant losses, UBS fired Mr. Munizzi and subsequently filed the required regulatory form reporting the reasons for his termination. On the form, UBS stated that Mr. Munizzi was fired because "he failed to adequately supervise employees" and because he "gave varied responses during the review." In response, Mr. Munizzi filed a claim against UBS for defamation and other related claims.

¶ 2    As required by Financial Industry Regulatory Authority (FINRA) Rule 13200 (see Fin. Indus. Regulatory Auth., Rule 13200 Required Arbitration (amended Dec. 15, 2008),

https://www.finra.org/rules-guidance/rulebooks/finra-rules/13200 [https://perma.cc/9AGF-2JZZ]), the claims were submitted to arbitration. After a hearing, a panel of three arbitrators found in favor of Mr. Munizzi and against UBS and awarded Mr. Munizzi damages in excess of $11 million—including compensatory and punitive damages, attorney fees, costs, and interest. The circuit court confirmed the award.

¶ 3     UBS appeals, arguing that the arbitration award should be vacated as against public policy and because the circuit court erred in concluding that the arbitration panel's factual findings were binding. UBS argues, in the alternative, that the award of punitive damages should be vacated. For the following reasons, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5     The record on appeal includes Mr. Munizzi's motion to confirm the arbitration award, UBS's motion to vacate the arbitration award, and the various exhibits that were attached to those motions. The exhibits attached to the motions include portions of *some* of the exhibits from the arbitration hearing itself and transcripts of *portions* of the testimony given by Mr. Munizzi and other witnesses at that hearing. The parties agree that neither this court nor the circuit court have been supplied with a complete record of the arbitration hearing. Based on the record that is before us, the history of this case is as follows.

¶ 6     Mr. Munizzi, a registered broker/salesperson and investment adviser representative, was hired by UBS in 2003. In 2016, Mr. Munizzi became the Chicago-area market supervisory officer, and his duties included overseeing the securities brokerage managers—who supervise financial advisors and accounts—in UBS's Chicago branch offices. According to Mr. Munizzi, he received exemplary annual assessments throughout his time at UBS and, in his 36 years working in the securities industry, he never failed a regulatory or internal audit or received a write-up or warning

of any kind.

¶ 7    On February 5, 2018, two UBS accounts suffered extraordinary losses. One was an employee account and the other was an account held by the mother of an employee. According to Mr. Munizzi's testimony at the arbitration hearing, these two accounts held specific options that can be profitable when "stock market volatility is relatively low" but will likely result in losses when stock prices fluctuate.

¶ 8    As also explained by Mr. Munizzi at the arbitration hearing, under regulatory and UBS requirements, customers who hold these risky types of options are subject to "margin" requirements, meaning those customers must maintain a certain level of assets in their accounts "based on the value of the margin position." If the options lose value, a margin call may be issued for additional collateral. If a customer does not respond to that margin call within five days—by, for example, depositing cash or eligible securities—the firm will sell investments in the customer's account to "meet the call." If the loss on the options exceeds the proceeds from the sale of investments in the account, UBS is liable for the resulting "unsecured debit," subject to potential collection from the customer.

¶ 9    The stock market was volatile on Friday, February 2, 2018, and at the end of that day, one of these accounts had "large unrealized losses in excess of $700,000" and the other had a "margin call" "that exceeded $800,000." The following Monday, February 5, 2018, the stock market dropped 1000 points, and by market close, the unsecured losses in both of these accounts had increased to more than $3 million. After an investigation into these losses, UBS terminated Mr. Munizzi on April 19, 2018.

¶ 10    As required by Illinois law and the FINRA rules, UBS filed a form U5—the "Uniform Termination Notice for Securities Industry Registration"—disclosing the termination. On the form

U5, UBS indicated that the "Reason for Termination" was that Mr. Munizzi was "discharged after firm review determined that (1) he failed to adequately supervise employees in association with the risks of an uncovered options strategy in employee and employee related accounts and (2) gave varied responses during the review."

¶ 11      Mr. Munizzi filed his complaint before the FINRA arbitration committee, alleging claims of defamation *per se*, a violation of the Illinois Wage Payment and Collection Act (Wage Act) (820 ILCS 115/1 *et seq.* (West 2018)), and tortious interference with prospective economic advantage against UBS. In his complaint, Mr. Munizzi alleged that "[w]hen registered employees are terminated, a summary of the U5 appears on FINRA's widely publicized BrokerCheck database," and that "[s]tatements about the termination of Registered Persons which indicate that an employee was incompetent or dishonest can severely impair their ability to obtain employment in the financial services industry." Mr. Munizzi alleged he had been "permanently injured by UBS's false and inaccurate reasons for termination" and that UBS had injured Mr. Munizzi "knowingly and with reckless disregard for [his] wellbeing and future ability to find employment." Mr. Munizzi sought, as relief, expungement and modification of the form U5, compensatory and punitive damages, attorney fees, and interest.

¶ 12      The parties arbitrated the claims before a three-member panel of the FINRA Office of Dispute Resolution. The hearing occurred over 13 days between June and November 2019 and included testimony from 17 witnesses and the admission of 243 exhibits.

¶ 13      The panel issued its arbitration award on December 11, 2019, finding UBS liable for $3,149,656 in compensatory damages, plus interest on the portion of that award that represented Mr. Munizzi's severance pay; $7.5 million in punitive damages; $496,753.36 in attorney fees; and $24,381.50 in costs. The arbitration award stated that the panel also "recommends the

expungement of the Reason for Termination and Termination Explanation in Section 3 of the form U5" filed by UBS regarding Mr. Munizzi. The arbitration award directed UBS to change the reason for termination to "Other" and the termination explanation to "Terminated without cause." The arbitration award said that this expungement was recommended "based on the defamatory nature of the information."

¶ 14    On December 13, 2019, Mr. Munizzi filed a motion to confirm his arbitration award in the circuit court pursuant to section 11 of the Uniform Arbitration Act (Arbitration Act) (710 ILCS 5/11 (West 2018)).

¶ 15    On January 10, 2020, UBS filed a motion to vacate or modify the arbitration award. UBS argued then, as it does now, that the award should be vacated because it violated an explicit Illinois public policy—namely, the policy "favoring protection of the investing public through the disclosure of information concerning negligent or dishonest securities professionals." UBS also argued that the award should be vacated because it was against the manifest weight of the evidence. In support of its motion, UBS attached excerpts from the arbitration hearing, the form U5 UBS filled out with respect to firing Mr. Munizzi, and Mr. Munizzi's amended statement of claim.

¶ 16    On October 21, 2020, the circuit court granted Mr. Munizzi's motion to confirm the arbitration award and denied UBS's motion to vacate the award. In its oral ruling, the court found that UBS had not shown the arbitration award was against the manifest weight of the evidence. In response to UBS's public policy argument, the court said that, even if there was a public policy exception:

"I find that UBS has not made the requisite showing that it is entitled to have the award vacated. And that's because after a hearing before three arbitrators there was testimony heard and evidence presented and the panel found that the statements made by UBS were

essentially not true. The panel specifically stated that certain portions of the U-5 form should be expunged based on the defamatory nature of the information. And by definition, defamatory means damaging the reputation by writing bad things that are not true.

Also, the panel awarded plaintiff compensatory and punitive damages for his claim of defamation and violation of the Illinois Wage Payment and Collection Act and tortious interference with prospective economic advantage. The panel, in short, found that UBS was not truthful and, thus, providing relief to UBS based on the public policy would require this Court to improperly reject the findings of the panel and the Court cannot do that so, therefore, the arbitration award will be confirmed."

¶ 17    On November 5, 2020, the circuit court entered judgment in favor of Mr. Munizzi for a total award of $11,170,790.86 as awarded by the arbitrators, plus additional attorney fees and costs in defending the award of $97,604.30, and $908,965.20 in interest from the date of the award.

¶ 18    This appeal followed.

¶ 19                                    II. JURISDICTION

¶ 20    The circuit court granted Mr. Munizzi's motion to confirm the arbitration award and denied UBS's motion to vacate the award on October 21, 2020, entering final judgment against UBS on November 5, 2020. UBS timely filed a notice of appeal on November 17, 2020. We have jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 21                                    III. ANALYSIS

¶ 22    A reviewing court will vacate an arbitration award "only in extraordinary circumstances" (*Yorulmazoglu v. Lake Forest Hospital*, 359 Ill. App. 3d 554, 564 (2005)), and must construe such awards, whenever possible, "so as to uphold their validity" (*Rauh v. Rockford Products Corp.*, 143

Ill. 2d 377, 386 (1991)). The limited circumstances under which a reviewing court can modify or vacate an arbitration award are set forth in the Arbitration Act, which states:

"(a) Upon application of a party, the court shall vacate an award where:

(1) The award was procured by corruption, fraud or other undue means;

(2) There was evident partiality by an arbitrator appointed as a neutral or corruption in any one of the arbitrators or misconduct prejudicing the rights of any party;

(3) The arbitrators exceeded their powers;

(4) The arbitrators refused to postpone the hearing upon sufficient cause being shown thereof or refused to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provisions of Section 5, as to prejudice substantially the rights of a party; or

(5) There was no arbitration agreement and the issue was not adversely determined in proceedings under Section 2 and the party did not participate in the arbitration hearing without raising the objection ***." 710 ILCS 5/12 (West 2018).

¶ 23    Judicial review of an arbitration award is "more limited than appellate review of a trial court's decision." *Rauh*, 143 Ill. 2d at 394. When reviewing arbitration awards, "there is a presumption that the arbitrator did not exceed [their] authority." *Id.* at 386. Additionally, an award will not be set aside "because of errors in judgment or a mistake of law or fact." *Galasso v. KNS Cos.*, 364 Ill. App. 3d 124, 130 (2006). This limited scope of review reflects the principle that an "arbitration award should be the end, not the beginning, of litigation." *Perkins Restaurants Operating Co. v. Van Den Bergh Foods Co.*, 276 Ill. App. 3d 305, 309 (1995).

¶ 24    UBS does not cite any of the bases set out in the Arbitration Act for overturning an arbitration award. Instead, UBS urges this court to vacate or modify the arbitration award because

it violates a "well-defined and dominant" public policy favoring the disclosure of information regarding negligent or dishonest conduct of securities professionals. UBS also argues that the award should be vacated because the circuit court erroneously concluded that it was bound by the arbitrators' findings. Finally, UBS argues in the alternative that this court should vacate the punitive damages award because it was excessive and contrary to public policy and the law regarding defamation. We consider each of these arguments in turn.

¶ 25                          A. Public Policy Exception

¶ 26     UBS argues that the arbitration award should be vacated because it "contravenes Illinois's well-defined and explicit public policy favoring the protection of the public through the full disclosure of information concerning dishonest or negligent conduct by securities professionals." UBS argues that the arbitration award penalizes it for "acting in direct furtherance" of this public policy and that enforcing the award will "chill the very conduct that federal and state law and Illinois public policy demands." Mr. Munizzi responds that public policy arguments are limited to arbitration awards arising from a collective bargaining agreement (CBA), and since this award does not arise from a CBA, the public policy exception does not apply here.

¶ 27     The Arbitration Act specifically distinguishes awards arising from a CBA from other arbitration awards. Section 12(e) of the Act states:

"Nothing in this Section or any other Section of this Act shall apply to the vacating, modifying, or correcting of any award entered as a result of an arbitration agreement which is *a part of or pursuant to a collective bargaining agreement*; and the grounds for vacating, modifying, or correcting such an award shall be those which existed prior to the enactment of this Act." (Emphasis added.) 710 ILCS 5/12 (West 2018).

¶ 28     Since the Arbitration Act was enacted in Illinois in 1961, our courts have continued to

recognize the rationale, grounded in common law, to vacate arbitration awards that are "repugnant to *** public policy" when they arise in collective bargaining cases. *American Federation of State, County & Municipal Employees, Council 31 v. Department of Central Management Services*, 173 Ill. 2d 299, 307 (1996) (*AFSCME*). As those courts have recognized, applying the public policy exception requires a two-step analysis in which the reviewing court must determine (1) "whether a well-defined and dominant public policy can be identified" and, if so, (2) "whether the arbitrator's award, as reflected in his interpretation of the agreement, violated the public policy." *Id.* at 307-08. In addition to being well-defined and dominant, the public policy identified must also be ascertainable "by reference to the laws and legal precedents and not from generalized considerations of supposed public interests." (Internal quotation marks omitted.) *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766 (1983).

¶ 29    The primary cases cited by both parties involve arbitration awards arising from a CBA. In *AFSCME*, the Illinois Supreme Court stated that "the historical context of the [public policy] exception is grounded in common law" and, therefore, "a court will not enforce a *collective-bargaining agreement* that is repugnant to established norms of public policy." (Emphasis added.) *AFSCME*, 173 Ill. 2d at 307. Rather than focusing on the award itself, these cases also tend to center on whether the CBA, as interpreted by the arbitrator, violates an explicit public policy. For example, in *City of Chicago v. Fraternal Order of Police*, 2020 IL 124831, ¶ 25, the court noted that "[t]he public-policy exception is a narrow one—one that is to be invoked only when a party clearly shows enforcement of the contract, as interpreted by the arbitrator, contravenes some explicit public policy." In that case, our supreme court found that an arbitration award requiring the city to destroy disciplinary records after five years violated an explicit public policy regarding the preservation of such records. Obviously, these concerns about interpreting an ongoing CBA

do not directly apply in this case.

¶ 30     UBS primarily relies on two cases to support its argument that the public policy exception extends to awards not arising from a CBA: *Heatherly v. Rodman & Renshaw, Inc.*, 287 Ill. App. 3d 372 (1997), and *Colmar v. Fremantlemedia North America, Inc.*, 344 Ill. App. 3d 977 (2003). According to UBS, the *Heatherly* and *Colmar* courts "expressly held that the public policy exception applied to non-CBA arbitrations" because that determination was "the essential first step in the legal analysis applied by both courts, and therefore constitutes a holding of both courts."

¶ 31     We reject UBS's reading of these cases. Both cases do indeed involve arbitration awards that do not arise from a CBA, but neither case comes anywhere close to "expressly" holding that the public policy exception applies outside of CBA arbitrations. Rather, both cases found the exception inapplicable and did so with no analysis of whether the exception might apply outside of the CBA context.

¶ 32     In *Colmar*, the court's "analysis" of the public policy exception was limited to four sentences, in which it described the exception, stated the test, then concluded that the plaintiff "fail[ed] to meet its burden by not identifying a well-defined and dominant public policy." *Colmar*, 344 Ill. App. 3d at 993. There was no express "determination" in that case that the public policy exception applied.

¶ 33     The court in *Heatherly* included more discussion of the exception, beginning with the two-step test used to determine if the award violated public policy. 287 Ill. App. 3d at 376. The court discussed several cases in which a "well-defined and dominant" public policy was or was not identified. (Internal quotation marks omitted.) *Id.* at 377. However, every case cited in *Heatherly* in support of this analysis involved an arbitration award arising from a CBA. See *id.* at 376-79 (cases cited therein). The *Heatherly* court did not acknowledge this, but instead determined that

- 10 -

the acts at issue did "not rise to the level of the sort of immoral or illegal acts that are so repugnant to public policy that an arbitration award based upon them must be vacated." *Id.* at 378.

¶ 34     In neither of these cases did the court specifically consider whether the public policy exception applies outside of the CBA context. In short, although UBS is correct that both *Colmar* and *Heatherly* considered the public policy exception in the context of arbitration awards not arising from a CBA, the courts found that the exception did not apply. Moreover, the courts in those cases offered no rationale for extending the public policy exception to non-CBA arbitrations, nor did they give any consideration to the fact that the Arbitration Act treats CBAs differently and lists five specific bases for vacating a non-CBA arbitration award.

¶ 35     The language of the Arbitration Act strongly suggests that the public policy exception has no application in this case. Rather, the Arbitration Act specifies different treatment for awards arising from a CBA and gives five specific reasons in section 12(a) that *other* arbitration awards can be modified or vacated. Supreme court cases that have applied the public policy exception have stressed the fact that there is an ongoing CBA and that it would be contrary to the public policy of this state to apply that CBA in the manner that the arbitrator's ruling mandated. UBS has offered no precedent in which a court has vacated an arbitration award on public policy grounds, outside of the collective bargaining context. Thus, we are not convinced that there is any basis for applying the public policy exception in this case.

¶ 36     Moreover, we agree with the circuit court that, even if the public policy exception did apply, the award in this case does not violate any "well-defined and dominant" public policy. UBS argues that the award should be overturned or modified because it violates an explicit Illinois public policy "favoring protection of the investing public through the disclosure of information concerning negligent or dishonest securities professionals." UBS states that the "[f]orm U5's

effectiveness *** depends on employers making full and frank disclosures" and that FINRA's by-laws make clear that "[c]andid and accurate disclosure of a regulatory or disciplinary problem *** is critical" See Nat'l Ass'n of Securities Dealers, Notice to Members 97-77 (Nov. 1997), https://www.finra.org/sites/default/files/NoticeDocument/p004412.pdf [https://perma.cc/3 HHS-ST93].

¶ 37    The arbitration panel recommended the expungement of the reason for termination and termination explanation on the form U5 "based on the defamatory nature of the information." In doing so, it cited *Republic Tobacco Co. v. North Atlantic Trading Co.*, 381 F.3d 717, 726 (7th Cir. 2004), which states that to succeed on a defamation claim under Illinois law, the plaintiff must show "that the defendant *** made a false statement concerning him" (internal quotation marks omitted) that was then published and caused damage to the plaintiff. Thus, the arbitration award reflects that the arbitration panel found that UBS made false statements about Mr. Munizzi. Therefore, the disclosures on the form U5 were neither "frank" nor "accurate." There is no public policy favoring false or defamatory disclosures by employers.

¶ 38                                 B. The Arbitration Panel's Findings

¶ 39    UBS also argues the circuit court erred in determining that the arbitration panel's factual findings "were binding on the court." UBS argues that courts can overturn arbitration awards when "the record *** belies the arbitrator's conclusions" (*Chicago Fire Fighters Union Local No. 2 v. City of Chicago*, 323 Ill. App. 3d 168, 180 (2001)) and contends that here the circuit court erroneously refused to consider the "undisputed facts of record."

¶ 40    We note that courts have authority to vacate an arbitration award only on limited bases (710 ILCS 5/12 (West 2018)) and that courts are generally "bound by the arbitrator's view of the facts" (*County of De Witt v. American Federation of State, County & Municipal Employees,*

*Council 31*, 298 Ill. App. 3d 634, 639 (1998)).

¶ 41    In this case, UBS has forfeited any argument that the arbitrators' factual findings were not supported by the record because UBS failed to supply this court with a complete record of the arbitration hearing. Illinois Supreme Court Rule 323(a) (eff. July 1, 2017) requires that the record on appeal "include all the evidence pertinent to the issues on appeal." However, as noted above, UBS did not provide a complete and official record. Instead, UBS provided this court with portions of documents and excerpts of testimony. Thus, this court has no basis for comparing the arbitrators' factual conclusions with the evidence presented, and the circuit court correctly recognized that the arbitrators' factual findings are therefore binding.

¶ 42                              C. Punitive Damages

¶ 43    UBS does not dispute that the FINRA arbitration panel was authorized to award punitive damages. Instead, UBS argues, again relying on public policy, that if the award is not vacated in its entirety, it should be modified to eliminate the punitive damages. According to UBS, enforcing punitive damage awards based on form U5 disclosures "would eviscerate" Illinois public policy favoring protection of the public by encouraging disclosure of information about the competence of securities professionals. UBS argues that, if punitive damages are permissible when "the undisputed record establishes that the information disclosed on the form U5 was fully supported by the facts," then securities firms will be "strongly discourage[d] *** from providing full and frank information on the form U5."

¶ 44    Again, this court is bound by the arbitrators' finding that UBS's disclosure was defamatory. Thus, this court cannot accept UBS's premise that it disclosed information that was "fully supported by facts." This is particularly true where, as here, we have not been provided with a full record. We therefore reject the argument that this award would disincentivize securities firms from

providing complete and accurate information on similar disclosures. Moreover, for all the reasons outlined above, we are not convinced UBS's public policy argument plays any role in this case.

¶ 45    UBS also argues that this court should reverse because the arbitrators made a legal error, where an award of punitive damages requires that the defamatory statements were made with "actual malice," which UBS asserts was not found in this case. There are two flaws in this argument.

¶ 46    First, an error of law does not provide a basis for overturning an arbitration decision. *Galasso*, 364 Ill. App. 3d at 130 ("[A]n arbitrator's award will not even be set aside because of errors in judgment or a mistake of law or fact.").

¶ 47    Second, UBS has not persuaded us that any legal error was made here or that the arbitrators did not find "actual malice." The arbitration award states that punitive damages are awarded "pursuant to *Republic Tobacco Co. v. North Atlantic Trading Co.*, 381 F.3d 717 (7th Cir. 2004) and *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704 (7th Cir. 1994)." In *Republic Tobacco*, the Seventh Circuit specifically said that "[p]unitive damages are available under Illinois law upon proof of actual malice." *Republic Tobacco*, 381 F.3d at 735. In *Baravati*, the Seventh Circuit held that in an arbitration which, like this case, involved a defamation claim by a terminated securities broker, the arbitrators did not exceed their powers in awarding punitive damages. *Baravati*, 28 F.3d at 710-11. The arbitrators' statement in this case that the punitive damages were awarded "pursuant to *Republic Tobacco*" reflects the arbitrators' understanding that punitive damages are available when there is proof of actual malice and defeats UBS's argument that the arbitrators failed to find such proof in the case before them.

¶ 48                                    D. Attorney Fees

¶ 49    Mr. Munizzi requests that, pursuant to section 14 of the Wage Act (820 ILCS 115/14 (West

2018)), we remand to the circuit court to allow him to present a petition for fees incurred during this appeal. UBS has not responded to this request, and we see no basis for denying it.

¶ 50                                         IV. CONCLUSION

¶ 51    For the foregoing reasons, we affirm the judgment of the circuit court and remand for Mr. Munizzi to file a petition for fees incurred during this appeal.

¶ 52    Affirmed and remanded.

| | |
|---|---|
| **No. 1-20-1237** | |

| | |
|---|---|
| **Cite as:** | *Munizzi v. UBS Financial Services, Inc.*, 2021 IL App (1st) 201237 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-CH-14398; the Hon. Caroline Kate Moreland, Judge, presiding. |
| **Attorneys for Appellant:** | Brain J. Poronsky and J. Matthew Haws, of Katten Muchin Rosenman LLP, of Chicago, and Thomas G. Hungar, of Gibson, Dunn & Crutcher LLP, of Washington, D.C., for appellant. |
| **Attorneys for Appellee:** | Steven P. Gomberg and Amy J. Kanarowski, of Lynch Thompson LLP, of Chicago, for appellee. |